648 So.2d 1000 (1994)
Victoria B. ROMAGUERA
v.
PICCADILLY CAFETERIAS, INC. and ABC Insurance Co.
No. 94-CA-374.
Court of Appeal of Louisiana, Fifth Circuit.
December 14, 1994.
Writ Denied March 10, 1995.
Jacob J. Amato, Jr., Lisa A. Dunn, Gretna, for plaintiff/appellee/cross-appellant.
*1001 Walter W. Christy, Thomas P. Hubert, New Orleans, for defendant/appellant/cross-appellee.
W.K. Christovich, Elizabeth S. Cordes, New Orleans, for amicus curiae, The Louisiana Restaurant Ass'n.
Before WICKER and GOTHARD, JJ., and BOUTALL, J. Pro Tem.
WICKER, Judge.
This is a personal injury suit by a cafeteria patron who was shot by an armed robber in the restaurant's parking lot. The main issue on appeal is whether the restaurant had a duty to provide security in its parking lot and, if so, whether the restaurant breached that duty. The trial court decided affirmatively on both issues and ruled in favor of the plaintiff. We affirm, for the reasons that follow.
On January 3, 1992 Victoria Romaguera was shot by an unknown assailant in the parking lot of the Piccadilly Cafeteria restaurant at 533 Lapalco Boulevard in Gretna. Mrs. Romaguera sustained serious injuries as a result of the shooting and filed suit against Piccadilly, alleging that the defendant failed to provide adequate security and failed to provide safe premises. Piccadilly's defense was that it owed no obligation to insure the safety of the plaintiff in the parking lot area and, therefore, it should not be held responsible for the damages resulting from the shooting. After a nonjury trial, the district court found in favor of Romaguera and awarded judgment against Piccadilly Cafeterias, Inc. in the amount of $763,721.00, plus interest from date of judicial demand, costs and expert fees. The defendant has appealed and the plaintiff has cross-appealed.
The issues are (1) whether Piccadilly had a duty to protect the plaintiff from injuries inflicted on her by an unknown perpetrator in the parking lot, (2) whether the evidence established that the risk of harm was sufficiently foreseeable to require the defendant to provide special security for the parking lot, (3) whether the security measures undertaken by Piccadilly were unreasonable or inadequate, and (4) whether the awards for general damages and loss of future earnings were inadequate.

FACTS
At about 7:00 p.m. on January 3, 1992, Mrs. Romaguera, accompanied by four children and her mother, pulled her car into the parking lot of the Lapalco Piccadilly, where she was planning to dine. As Mrs. Romaguera was getting out of her vehicle, a Suburban truck pulled up behind her, blocking both her car and the car parked next to her. A black male emerged, wearing a bandanna over his face and holding a gun. He approached Mrs. Romaguera, who told him, "Don't take me." He shot her and she lost consciousness.
Three of the four children with her ran into the restaurant, but her youngest daughter and her mother, Patrina Sunseri, were still in the car. The assailant leaned into the car and put his gun on Mrs. Sunseri, who fainted. Connie Guilbeau, a Piccadilly patron who was parked in the space next to Mrs. Romaguera's car, observed the attack. When Mrs. Guilbeau realized what was happening, she threatened the assailant with a gun she had in her car. He jumped in the passenger side of the Suburban and fled the scene.
There was evidence that the perpetrators in this case probably committed two armed robberies the same night as the attack on Mrs. Romaguera. In one of those incidents the victims were shot as well.
There had been an attempted armed robbery of the Piccadilly's cashier in October 1990. Subsequently, the management posted a security guard (an off-duty Jefferson Parish sheriff's deputy) inside the restaurant between six o'clock and ten o'clock each night. The guard was instructed to stay near the cash register. Although the guard sometimes walked patrons to their cars at their request, the management made no attempt to post a guard in the parking lot or outside in front of the restaurant. The side parking lot was not visible from inside the restaurant and the security guard on duty when the plaintiff was shot was unaware of the incident until it was over.
*1002 Richard Means, manager of the Lapalco Piccadilly, testified that the company had no policy or procedures for dealing with patron security. Installation of security was primarily a decision for each individual manager to make, with approval through the chain of command. Means stated that after the October 1990 attempted armed robbery, he contacted the Jefferson Parish Sheriff's Office about placement of a security detail. He spoke to Captain Don Cambre, head of the Detail Office, who sent Deputy Verlean Thomas to see him. After discussion, Deputy Thomas and Means agreed that since there had been no incidents in the restaurant's parking lot the security guard should be placed inside to protect the cash register. Means said his primary concern was to protect the cash box. No one performed a security analysis.
Means' testimony was supported by that of several executives of the Piccadilly corporation, who indicated the company relied on the judgment of individual managers and the local sheriff's office or police department of each restaurant location to determine security needs. At least two other Piccadilly restaurants in the New Orleans area have exterior security guards as well as interior. None of the Piccadilly employees have had any training in security. Their testimony was that the primary means Piccadilly uses for restaurant safety is to try to choose low-crime areas when selecting sites for new restaurants, and to provide their buildings with adequate lighting and parking facilities. In lighting their parking areas, they simply comply with parish building code requirements. The Lapalco Piccadilly restaurant was built in 1982.
Wade D. Schindler, Ph.D., testified for plaintiff as a security expert. Dr. Schindler reviewed the Jefferson Parish crime statistics for 1989 through 1991 and determined that within the quarter-mile "grid" in which the Piccadilly restaurant is located, there had been 109 weapons incidents reported during the three-year period, as well as a high proportion of person-to-person crime within a two-mile circumference of Piccadilly. He testified that the number of crimes in the area is much higher than the average for Jefferson Parish, especially crimes involving automobiles. In his opinion the type of crime which occurred in this case is foreseeable because of the sheer numbers of crimes that had occurred involving automobiles and aggravated crimes.
In addition, Dr. Schindler pointed out that the restaurant is located on a major thoroughfare which provides easy access to criminals and affords them a quick escape route. The restaurant is surrounded by boarded-up and abandoned shops to the rear, abandoned parking lots to the rear and east side, an empty lot to the west, and a main thoroughfare at the front. He said these factors are warning signs to anyone with security training because they show the area is vulnerable. Further, the restaurant has no windows on its west side (the side on which the plaintiff had parked), so the guard cannot see that parking area from the cash register location, nor be seen by potential robbers who are in the west lot.
Further, Dr. Schindler performed lighting tests in the west parking area and determined that the area in which the shooting occurred registered .5 and .7 foot candles, well below the two to five foot-candle-power he stated is required. He opined that the lighting was inadequate and was an additional cause for security concern, because insufficient lighting invites crime. He admitted he had no training as an electrical engineer, but had taken a course in security lighting.
Finally, Dr. Schindler said that the visibility factor is the most important issue in protection for visitors and employees of the restaurant and there should have been visible security in the parking lot. In his opinion, the presence of an armed security guard would more probably than not have deterred the perpetrators. He felt that if there was only one security guard, that guard should have been posted outside the restaurant, continuously patrolling the parking lot and providing highly visible warnings to would-be criminals.
Deputy Verlean Thomas, who was in charge of the security detail at the Lapalco Piccadilly, and Captain Don Cambre, her supervisor, both testified they had conducted no security survey prior to setting up the *1003 security detail for the restaurant. Nor had they obtained police statistics on incidents reported in the neighborhood of the restaurant. Captain Cambre testified he can obtain Sheriff's Office computer statistics on crime in the district areas, but it is not his custom to do so. Instead, he and Deputy Thomas relied on their personal knowledge of area crime in making their recommendations to Means. They both considered Piccadilly to be a very low-risk detail because the restaurant does not serve alcohol, has a family-oriented atmosphere, and was in what they considered to be a low-crime area.
Piccadilly did not present an expert in security, but did present an expert electrical engineer who had tested the light levels in the parking area. He testified that the lighting in the Piccadilly parking lot at the site of the incident met the standards of the Illuminating Engineering Society, which are the standards generally used by lighting engineers. He admitted, however, that he had no training in security lighting and did not know the criteria for security lighting.

LIABILITY
In Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La. 7/5/94), 639 So.2d 216 at 220-221, our supreme court's most recent pronouncement on the standard of review of factual findings, the court stated:
In Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), this Court held that the court of appeal should not upset the factual findings of a trial court absent manifest error or unless clearly wrong. A proper review, therefore, cannot be "completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record established that the finding is not clearly wrong." Id. at 1333. More recently, regarding this constitutional appellate review of fact in civil cases, La. Const. art. 5, Sec. 10, we have had occasion to say in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), a case which involved the review of damages, that "the discretion vested in the trier of fact is `great,' and even vast," and in Stobart v. State, 617 So.2d 880, 882-83 (La.1993), which involved the standard of review of findings of fact, a "court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,'" and "where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Id. In each of these cases there was but a perpetuation of the principle set down in Arceneaux.
Notwithstanding the Court's earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La. 1993), it was not our purpose in that case to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset. Although deference to the factfinder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts. * * * Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support. * * * [Footnotes omitted.]
In deciding that Piccadilly was liable, the trial judge stated in his written reasons for judgment:
The facts established that Piccadilly recognized that the risk of crime on the premises was sufficiently foreseeable to require special protection. * * * The Court agrees with the plaintiff's contention that Piccadilly undertook to provide security and the security was inadequate to protect patrons from foreseeable crime risks. The Court is convinced that had an armed security guard been present outside the premises in a visible location, it is more *1004 probable than not that the crime would not have taken place.
Over the past fifteen years there have been several Louisiana cases that discussed the liability of a business for third-party attacks on its patrons. The most recent case from the state supreme court is Mundy v. Dept. of Health & Human Res., 620 So.2d 811 (La.1993), in which a nurse at Charity Hospital in New Orleans sued for injuries suffered when she was attacked and stabbed by an unknown assailant in a hospital elevator. The trial court rendered judgment for the plaintiff, but the court of appeal reversed. The supreme court affirmed the court of appeal's ruling, holding that the owner or operator of a facility has a duty to exercise reasonable care for the safety of persons on the premises and a duty not to expose such persons to unreasonable risks of injury or harm. Although that duty does not extend to unforeseeable or unanticipated criminal acts by third persons, when the duty to protect others against such criminal misconduct has been assumed, liability may be created by a negligent breach of that duty. Although the hospital had a staff of 25 security officers on duty at the time of the incident, the plaintiff's evidence of a single prior criminal incident at the bank of elevators she was using that night was insufficient to conclude that the security measures were unreasonable or inadequate. The court ruled that the defendant did not breach its duty, because even if security guards had been posted in the lobby, they could not have prevented the attack, which took place within the elevator, and even assuming the elevator alarm malfunctioned, this would not have prevented the assailant from entering the elevator in the first place.
Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984), was a lawsuit over the death of one patron and the injury of another by a shotgun blast during an armed robbery of the restaurant. The restaurant was in a high-crime area and had been robbed or burglarized more than 20 times. There was a security guard on duty, but when the armed robbers entered he was sitting at a table obscured from view behind a partition. The supreme court found the restaurant was liable, stating that a business which undertakes to hire a security guard to protect itself and its patrons is liable for physical harm which occurs because of negligence on part of that guard. The court found this armed robbery was foreseeable and more than a mere possibility due to the restaurant's history of robberies, most of which had occurred during the hour in which this robbery occurred. The security guard's failure to maintain high visibility to the public and his moving when ordered not to do so by the gunman provoked the attempted robbery and the shooting. The guard's failure to be alert and visible at the time of the crime constituted negligence and a breach of his duty to the patrons of the restaurant, as did his movement in the face of the shotgun.
In Hanewinckel v. St. Paul's Prop. & Liability, 611 So.2d 174 (La.App. 5th Cir.1992), an Ochsner Hospital nurse who was attacked and beaten during an attempted rape in a parking lot sued the hospital. The trial court entered judgment in her favor, which was upheld on appeal to this Court. We held that where a duty has been assumed to provide a security guard, the court must decide whether that guard was acting with reasonable care to prevent the harm incurred. The evidence supported the determination that the failure of the guard service to adequately patrol the area, despite warnings of an intruder's presence, was the cause of the plaintiff's injuries. This Court concluded the hospital breached its duty to its employee by failing to patrol the parking lot.
Considering the applicable jurisprudence, we find no manifest error in the trial court's conclusions. The facts here differ from those in Mundy and are closer to those in Harris and Hanewinckel. In Mundy, the hospital had a large staff of security personnel, there was a guard posted in the east elevator lobby, and the attack occurred within an elevator. The court concluded that, under the circumstances in that case, the harm was not foreseeable, additional security guards could not have prevented it, and the hospital had adequately fulfilled its duty to the plaintiff. In this case, however, it is plain under the facts of the case that not only was the harm foreseeable, but that it could easily have been *1005 prevented by the visible presence of an armed security guard. The fact that there had been an attempted armed robbery inside the restaurant should, we think, make any reasonable person realize that such an attempt would be even more likely to occur outside the restaurant in the parking area, where there would be fewer people around.
Piccadilly assumed the burden of providing security and had a duty not to be negligent in providing that security. Although several other Piccadilly stores had security guards for both the restaurant interior and the parking lot, there was no general corporate plan to provide security, either inside the restaurants or in the parking lots. A business which is negligent in providing security or which provides inadequate security is responsible for damages suffered by its patrons as a result. The plaintiff's expert, on whose testimony the trial judge relied, produced statistical evidence that the general area of the restaurant was unsafe. The defendant failed to rebut that evidence adequately.
The deterrent effect of an armed security guard is evidenced by the fact that the assailant fled when Mrs. Guilbeau pointed her gun at him. Mrs. Guilbeau's presence likely saved the life of the plaintiff, her mother and her child. If Piccadilly had had an armed security guard in a highly visible location outside, more likely than not the harm to the plaintiff could have been prevented.
The Louisiana Restaurant Association (LRA) filed an amicus curiae brief in this case, arguing that affirmance of the trial court's decision will result in increased costs to businesses and consumers in this state and may very well lead to loss of services due to businesses being forced to move out of certain areas. Both Piccadilly and the LRA contend that the crime here was committed by two sociopaths on a crime spree and, therefore, was random, unpredictable, and not reasonably foreseeable.
We do not agree. All crimes are "random" from the victims' point of view. Under the facts here, we believe Piccadilly should have been aware of the potential for crime in its neighborhood and the likelihood of this type of crime. In the modern urban environment a business which undertakes to provide parking for its customers should determine whether security is required for the parking area and, if so, should ensure that adequate security is provided. Increased expense is a small sacrifice to make for protection of human life.

DAMAGES
After police and emergency technicians arrived on the scene, Mrs. Romaguera was taken by ambulance to Meadowcrest Hospital, where she underwent emergency surgery by a team of four surgeons. The gunshot had shattered her right femoral shaft and severed the popliteal artery of her right leg, leaving her with a severely comminuted fracture of the distal femur and transection of the femoral artery. She had no blood flow in the lower leg and required a vein graft to restore blood in the popliteal artery, plus open reduction and internal fixation of the fractured femur. She was hospitalized for 17 days, mostly in the intensive care unit, and remained bedridden at home for several months. During that time she required assistance from hired help to tend her bodily needs.
After extensive physical therapy she regained her ability to walk. She now must use a cane and has a Trendelenburg gait and a gluteal lurch. She has a permanent one-inch leg-length discrepancy and suffers constant severe pain in her right leg and knee due to a permanently rotated femur and to extensive metal hardware which had to be implanted during her surgery. She also suffers severe back pain due to the awkward gait. Further, her right foot turns inward and she must wear a custom-designed built-up shoe on the right foot. She may undergo two future orthopedic surgeries to attempt to alleviate some of her pain and deformity, and also will likely require future vascular surgery to replace her vein graft.
At the time of her injury Mrs. Romaguera was 38 years old and employed as the Director of Pharmacy of F. Edward Hebert Hospital, earning approximately $60,000 per year. She has been unable to work since the shooting and contends she will never be able to return to her former employment. She *1006 suffers from post-traumatic stress disorder and is undergoing psychological counseling. She is married and is the mother of three minor children. The physical and psychological effects of the shooting and resultant injuries have caused profound changes in Mrs. Romaguera's life. They have severely affected her relationships with her husband and her children as well as all her activities.
The damage award was apportioned as follows:

Past medical expenses $ 95,000.00
Future medical expenses (including expenses $ 71,000.00
for psychiatric treatment)
Loss of earnings, past and future $220,521.00
Physical and mental pain and suffering,
past and future $375,000.00
 ___________
TOTAL $761,721.00
 ===========

Piccadilly did not seriously dispute the extent of the plaintiff's injuries at trial. In fact, Piccadilly does not raise quantum at all on its appeal. The plaintiff, however, contends in her cross-appeal that the trial court erred in determining that she will be able to return to work within four years from the date she was injured. The plaintiff contends she is permanently and totally disabled from gainful employment. She contends her award for loss of earnings and earning capacity should be increased to $1,991,807.00, the amount to which her economist testified. She also seeks an increase in the award for pain and suffering, but is not specific as to the amount sought. Piccadilly opposes any increases.

General Damages
The applicable standards for review of general damage awards was restated by the supreme court recently in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) in which the court stated, at 1260-1261:
In Reck v. Stevens, 373 So.2d 498 (La. 1979), this Court commented on appellate review of general damage awards and on the "much discretion" in fixing damages accorded to trial courts by La.Civ.Code art. 1934(3) (1870). * * * The decision pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
In Reck, this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. * * * Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. * * *
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges ... is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. [Footnotes and citations omitted.]
Relying on these precepts, we can state with conviction there was no clear abuse of *1007 discretion by the trial court in the award for general damages.

Future Loss of Earnings
The award for loss of future earnings was predicated on the trial judge's finding that the plaintiff will be able to return to work within four years of the date of the injury. Stating that he was basing the award on the testimony of the plaintiff's vascular surgeon, her orthopedic surgeon, her psychiatric social worker, and the defense psychologist, the judge found it more probable than not that the plaintiff will be capable of returning to her former occupation following the future surgeries discussed by her treating physicians. For the amount of the award the judge selected the figure supplied by the plaintiff's expert economist, Dr. Melville Wolfson, for a four-year total loss of earning capacity. Dr. Wolfson's figures and calculations were not rebutted by the defense.
Reviewing the record in its entirety, we are unable to say that the trial judge was clearly wrong in concluding that plaintiff will be able to return to work four years post-injury. Mrs. Romaguera is a strong, persistent and stoic person. Given her past history and her determination to succeed, we believe it more likely than not that she will return to work within her field, pharmacy, and will continue to advance within it. Bearing in mind the wide discretion accorded the trier of fact in making factual conclusions and in assessing damages, we affirm the award for future loss of earning capacity.

DECREE
For the foregoing reasons, the judgment of the district court is affirmed.
AFFIRMED.