711 So.2d 703 (1998)
Fred PETERSON
v.
GIBRALTAR SAVINGS AND LOAN, Club West, Inc., The Galleria Investment Corporation, d/b/a Galleria One and/or The Galleria, et al.
No. 97-CA-725.
Court of Appeal of Louisiana, Fifth Circuit.
February 20, 1998.
Rehearing Denied May 15, 1998.
*705 Andre' P. Guichard, New Orleans, A. Bruce Netterville, Gretna, for Plaintiff/Appellant Fred Peterson.
Al M. Thompson, Jr., New Orleans, for Appellee Gibraltar Savings and Loan.
Plauche, Maselli & Landry, Arthur W. Landry, New Orleans, for Defendant/Appellee New Orleans Private Patrol Service, Inc.
Before GRISBAUM, GAUDIN and CANNELLA, JJ.
CANNELLA, Judge.
Plaintiff, Fred Peterson, appeals from a judgment in his suit against multiple defendants for injuries he received when he was abducted from The Galleria, a retail and business office mall in Metairie, Louisiana. The judgment, rendered after a jury verdict, found that defendants, Gibraltar Savings and Loan (Gibraltar), Metairie Center Phase 1, FGMC, Ltd. and New Orleans Private Patrol, Inc. (NOPPS), were not liable.[1] We reverse in part, affirm in part and render in part.
On the evening of May 20, 1988, plaintiff, a 26 year old male, and a friend, Wendy Whiteman (Whiteman), went to a popular local nightclub, Club Galleria West, located in The Galleria in Metairie, Louisiana. NOPPS provided security services in the garage of the Galleria. Whiteman drove and parked her car on the first level of the six story parking garage near the entrance to the interior elevators. The club was extremely busy, catering to up to 2,000 people per night. The clientele ranged in age from 18 to 30 years old. While there, plaintiff and Whiteman became separated. Around 1:00 a.m., plaintiff began looking for Whiteman because he was ready to leave. As he exited the interior of the building and entered the parking garage, two black men dressed in blue jeans and T-shirts forced him into a car at gunpoint. They drove to a house in New Orleans. Before arriving at the house, plaintiff made an attempt to escape, whereupon the men beat him with a pipe. Once in the house, they beat and sodomized plaintiff and forced him to perform oral sex. Next, the perpetrators drove plaintiff to an uptown area, where he was thrown out of the car. The men stole plaintiff's wallet and five thousand dollars worth of jewelry that he inherited from his deceased father. Plaintiff walked to a nearby shopping center where he received help and called his mother. His mother drove plaintiff to Charity Hospital, where he was examined and treated.
Sometime later, in 1992, plaintiff attempted to donate blood for his mother's surgery. At that time, he discovered that he was HIV (immunodeficiency virus infection) positive and had AIDS (auto-immune deficiency syndrome).[2] *706 Plaintiffs' condition is incurable and fatal.[3]
Plaintiff filed suit against defendants on March 2, 1989. Various parties filed thirdparty actions. Club Galleria West, Inc. and First Financial Insurance Company were eventually dismissed from the suit. A jury trial of the matter was held on December 9-13 and 16-17, 1996. The jury found that plaintiff was abducted from The Galleria and raped, but that defendant, Gibraltar, did not breach its' duty to provide a reasonably safe parking area for its patrons. The jury further found that defendant, NOPPS, did not breach its' duty to discharge its' security obligations in a reasonable and prudent manner. The jury verdict was reduced to a judgment, dated January 13, 1997, dismissing plaintiff's case and the third-party demands. Plaintiff filed a Motion For Judgment Notwithstanding The Verdict (JNOV), and, In The Alternative, For A New Trial which were heard on April 16, 1997 and denied on April 23, 1997.
On appeal, plaintiff asserts that the JNOV should have been granted because the evidence of defendants' liability preponderates in his favor.
Plaintiff also asserts that the Motion for New Trial should have been granted because of legal errors in the trial.[4] We need not address the latter because of our ruling on the JNOV.

JNOV AND THE EVIDENCE
In Anderson v. New Orleans Public Service, 583 So.2d 829, 832 (La.1991), the court stated:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied ... In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. (Citations omitted)
Lambert v. State Through Dept. of Transp. & Development, 96-160 (La.App. 5th Cir. 10/16/96); 683 So.2d 839, 845.
In order to determine whether liability exists under the facts of a particular case, Louisiana courts apply a duty/risk analysis. Under this analysis plaintiff must prove:
(1) the conduct in question was the cause-in-fact of the resulting harm
(2) defendant owed a duty of care to plaintiff
(3) the requisite duty was breached by the defendant
(4) the risk of harm was within the scope of protection afforded by the duty breached
Mundy v. Department of Health and Human Resources, 620 So.2d 811, 813 (La.1993). Whether a duty is owed is a question of law, whereas, whether defendant has breached a duty owed, is a question of fact. Id. at 813.
In general, the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his *707 premises and the duty of not exposing such persons to unreasonable risks of injury or harm. Mundy v. Department of Health and Human Resources, 620 So.2d at 813; Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1369 (La.1984). This duty does not extend to unforeseeable or unanticipated criminal acts by third persons, but when the owner or operator of a facility has assumed a duty to protect others against such criminal misconduct, liability may be created by a negligent breach of that duty. Id. at 813; Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d at 1369; Romaguera v. Piccadilly Cafeterias, Inc., 94-374 (La.App. 5th Cir. 12/14/94), 648 So.2d 1000, writs denied, 95-0093 (La.3/10/95), 650 So.2d 1183 and 95-0124 (La.3/10/95), 650 So.2d 1184; Hanewinckel v. St. Paul's Prop. & Liability, 611 So.2d 174,179 (La.App. 5th Cir.1992), writ denied, 614 So.2d 65 (La.1993). Furthermore, "when a security guard fails to act in accordance with established policies and procedures and that negligence is a substantial factor in bringing about injury to a third party, it can support a jury finding of causation." Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d at 1369.
As in the Mundy case, the question here is not whether the owners/ operators had a duty to hire security guards. That duty was already assumed by them. The question here is whether the security measures or procedures undertaken by them were reasonable. Likewise, the question is whether NOPPS breached its duty to perform the garage security services in a nonnegligent manner.
In this case, the record shows that NOPPS had a contract with defendant, Metairie Center Phase 1, to provide security services. The agreement specified that two guards patrol the garage, one on foot and one in a vehicle with flashing lights. A third guard/supervisor was to remain in the security hut in the rear of the garage on the first level. This was an auxiliary station where the guards stored their equipment, the telephone was located and the television screens for the surveillance cameras installed in the building were viewed. Pursuant to policy and procedures, the office guard was to remain in contact with the roving guards by radio. His job also required him to maintain a log describing any incidents in the garage, actions taken by the roving guards and whether the areas were secure, as reported by the roving guards on their radios. He watched the surveillance screens that were located in the building. In addition, he collected the guards equipment when they went off duty and delivered the equipment to the arriving guards. However, there was no written security plan. Furthermore, the defendants did not perform a security analysis relative to this particular arrangement to determine the needs of the building and garage in light of the nature of the businesses and criminal history of the area. The only security planning that had been done was in the construction phase. A letter was introduced into evidence indicating that a plan was to be forthcoming, but it was never completed.
In addition to the security guards, the management or owners hired four Jefferson Parish Sheriff's Office (JPSO) deputies to work detail duty, six days per week in the interior of the building because of the nightclub. However, all four remained on duty inside the building.
The evidence further showed that the building, completed in 1987, initially had security booths installed at the entrances to the parking garage. They were dismantled and removed prior to the abduction and kept in the rear of the garage. Management felt that access controls were not feasible for the types of businesses in the building (movie theater with eight movie screens, game room, health club and food court).
On the evening and morning of the abduction, the log reflected that the guards checked in every 30 minutes, reporting that the areas were secure or noting any minor activity. However, the log also disclosed a missing entry for the guard with the truck at 1:00 A.M., the precise time that the abduction occurred. There were entries at 12:30 a.m and 1:30 a.m., leaving a period of one hour during which the whereabouts and activity of the guard were unknown. All the security witnesses agreed that there should have been an entry and that it was good *708 procedure and policy to have exact check-in reports logged. A significant defect in the security of The Galleria parking lot at the time of the abduction was shown by the absence of the log entry.
Fred Jackson (Jackson), a security guard on duty on the shift prior to this incident, testified for plaintiff. He stated that the guards were required to check-in every 30 minutes. He could not explain the missing log entry. He further testified that, when the nightclub was open, there were many people going in and out of the building and garage. May 19th was a Thursday, which was one of the club's busiest nights. In addition, historically there is more criminal activity at night. Jackson stated that it was usual for the guards to challenge people merely sitting in their cars, especially when the nightclub was open and, had he seen two men doing so, he would definitely have asked why they were there. Jackson testified that since the male club patrons were usually attired in shirt, ties and slacks, he would have been suspicious of two men attired in blue jeans and T-shirts who were just sitting in their car. He noted that the actual entries in the log were made by the guard in the office and a missing entry did not necessarily mean that the guard did not call in.
Whiteman also testified. Plaintiff rode in her car to the club and she was his ride home. Whiteman stated that when they arrived, she parked her car on the first level of the garage near the elevators. She noted that there were no signs erected anywhere in the garage informing the public where to find the security hut. Whiteman testified that she left the club between 12:30 and 1:00 a.m. and went into the garage looking for plaintiff. She stated that she did not see any guards or JPSO deputies at that time. When she could not find plaintiff, she went home. The next day, Whiteman learned about plaintiff's ordeal.
John Lombardi (Lombardi), an expert in crime statistics analysis, criminology, security, victimology, security litigation and the drafting of security documents, testified for plaintiff. In his opinion, the security in place was inadequate for several reasons. First, he stated that there are three lines of defense in a security plan. Here, the first line of defense was the access to the building in the garage, the second was the elevators or access to the building and the third was in the building itself. Lombardi testified that here, there was no "first line of defense" to impede the access of criminals to the garage area. Here, the garage was open to anyone. In his opinion, an access control system should have been installed and utilized, especially considering that there was a nightclub serving liquor in the building. Lombardi was explicit that the abduction would not have occurred had there been a booth or arm-type barrier restricting access. Although he noted that the Protection of Assets Manual, commonly used by the security industry, does not necessarily recommend access controls for businesses that have free flowing traffic, such as movie theaters and shopping malls, he felt that this building was different because of the nightclub. Lombardi also noted that restricted entry with booths and/or arm barriers would not necessarily discourage serious criminals, but strongly believed that it would have in this case because this type of criminal, who intends to leave with his victim, would likely not chance an encounter with a booth attendant. He also agreed with defendants that the Mall of America, the largest mall in the country, does not have any access controls, but distinguished that mall because it is a true retail shopping mall, unlike this mall, which also had two floors of non-retail type offices.
Lombardi next found that the security was sub-standard because the guard training was minimal or non-existent, there was no written security survey or plan to establish the reasonable standard of care for that facility and there was no input from the tenants, local law enforcement and civic groups or periodic review of the security with community and law enforcement input. He said that these items were important because the JPSO statistics showed a significant increase in incidents from 1987 to the date of this incident in 1988. In the entire year of 1987 there were fifty-six incidents. In the first four months of 1988 there were eighty-seven. He stated that, although many of the crimes *709 listed were property crimes, those types of crime foretell crimes upon the person. Lombardi noted that most of the calls to the police occurred at night. He said that this increase in incidents should have alerted management and the security company and they should have re-formatted the security accordingly. While he noted that some of the calls in the statistics were for fire alarms and ambulance calls, he said that did not relieve defendants of the need to reconsider the security plan in light of the increase in other incidents.
Referring to the missing log entry, Lombardi stated that it indicated to him that the patrol was not made and the guard was not where he was supposed to be. He noted that a prior entry was made later than at the 30 minute mark, but emphasized that the notation was in fact made. Thus, had something delayed the entry, it would have been noted like the prior entry. Lombardi was also shown an entry that states that the guard who was walking the garage reported that the high-rise staircases were secure. He interpreted the entry to mean that the guard was in the interior of the stairwell, rather than in the garage where he was supposed to be.
Lombardi testified that the guards did not receive proper training. The company did not provide a training program and there were no updates to the training that they did have. The only training the guards had were sixteen hours of state-mandated classwork and on-the-job training. However, the guards assigned to The Galleria were lieutenants and sergeants and The Galleria's manager and a representative of the security company performed random inspections of the security.
Plaintiff cites Romaguera v. Piccadilly Cafeterias, Inc. to support his arguments. In Romaguera, a patron of Piccadilly Cafeteria was shot by a man in a truck as she was exiting her car parked in the Piccadilly parking lot. Plaintiff produced evidence of a prior attempted armed robbery in the restaurant, subsequently, management posted a security guard near the cash register, but not in the parking lot. Piccadilly had not performed any security analysis. The uncontradicted evidence showed that had it done so, it would have discovered a history of numerous crimes with weapons occurring in the area around the cafeteria. The court further pointed to an absence of a written security plan. These factors demonstrated to the court's satisfaction the foreseeability of the attack on Romaguera. In Romaguera and here, the actions of defendants in having no specific security plan and no update are identical. Those actions in Romaguera were the basis of defendant's negligence.
In this case, there was a significant increase in crime in The Galleria from 1987 through May of 1988. Regardless of the type of crimes reported, this increase should have placed defendants on notice that crime was increasing and a crime problem was developing. Furthermore, some of the incidents in the building were crimes on persons. We note that the garage itself is approximately 6,000 square feet, but the interior of the building was not so far removed from the garage that these incidents should have been ignored. We must add to this the breach of good security practice to have a written plan reviewable regularly. Additionally, the fact that the most reasonable interpretation of the log notations, or lack of them, indicate that one or both of the roving guards were not where they were supposed to be at the time of the abduction. Also, the missing entry at a crucial time indicates that the guard did not report in at all, otherwise, it is logical to suppose that the office guard would have noted it later in the log, as he did for an earlier entry. Defendants produced no evidence that the missing entry meant anything other than it was not made. Defendants could have simply rebutted this inference with the testimony of the guards on duty, but they did not, except saying that one was deceased. However, it is uncontradicted that the guards failed to follow their own policy and procedures by not reporting in and/or failing to report why there was no entry at the exact time of the abduction. In addition, the owners/operators ignored the upsurge in pertinent criminal statistics, failed to regularly analyze the property's real security needs as they evolved and failed to document an effective plan to deal with the growing need *710 for an updated security system. This was particularly important because of the existence of the liquor-serving nightclub. Although we recognize that the guard may not have been in the area of the abduction even if he were on his regular patrol, his visible presence may have forestalled the incident. Further, he may have seen the two men waiting in their car and challenged them. Concerning an access gate, which was put in and then removed by Gibraltar, it would have been an added layer of protection, a line of first defense. Since several malls with movie theaters in this area are access controlled, it is realistic for a building with these types of businesses to have access control. If nothing else, an access gate provides a visible barrier. We note that Richard Condon, defendants' expert in security and criminology, disagreed with all of the conclusions of Lombardi. However, we find that, when we consider the totality of the actions of defendants and NOPPS, the owners/operators and NOPPS had and breached their duties to plaintiff.
Applying the standard for review for a motion for JNOV, we find that "the facts and inferences point so strongly and overwhelmingly in favor of plaintiff that reasonable men could not arrive at a contrary verdict." Anderson v. New Orleans Public Service, 583 So.2d at 832. Consequently, we find that the trial judge erred in denying the Motion for Judgment Notwithstanding the Verdict.
CAUSATION
The jury never reached the issue of causation because it found that defendants did not breach their duty to plaintiff. Thus, we must review the evidence de novo.
Plaintiff, a heterosexual, testified he did not take illegal drugs, have sexual relations with prostitutes or participate in homosexual activities. He never had a blood transfusion. In 1986, plaintiff donated blood for a friend's surgery without any problems. The East Jefferson Emergency Room records show, and he admitted, that he was treated for lacerations and contusions from fistfights in 1984, 1989 and 1990.
Plaintiff's girlfriend, Debra Eubanks, started dating plaintiff before the abduction in 1988. They have dated on and off since that time. In 1994 and three weeks before trial, Eubanks tested negative for HIV. She confirmed that plaintiff was heterosexual and did not take illegal drugs or consort with prostitutes.
Dr. Robert Marier, an expert in epidemiology and infectious diseases, testified that, based on plaintiff's history and laboratory tests, it is more probable than not that plaintiff contracted the disease when he was raped. He noted that plaintiff was treated on two occasions for injuries and stated that a person can contract the disease through an exchange of blood. However, he explained that it was rare and that such a risk relates primarily to health care workers. The doctor noted that neither blood nor semen was found when plaintiff went to the emergency room, but that it was not unusual in anal rape cases not to find semen.
Dr. Charles Preston who treated plaintiff in Charity Hospital's emergency room, testified that plaintiff's shirt was torn and had possible blood stains. Plaintiff had abrasions, lacerations, contusions and burn marks on his body. The area around the rectum was red and there was a hematoma in the rectal area, but no external blood was found. He noted that in anal sex, internal tears may occur. Those would not be noticed without a rectal exam, which was not done. In addition, no semen was noted, but the doctor stated this was not unusual in an anal rape. That was further supported by the testimony of Patricia Daniels, a medical technologist, who works for the Coroner's Office. Dr. Preston testified that when he examined plaintiff, plaintiff appeared to be in pain, had his arms folded, was tearful, talked quietly and looked at the floor.
Dr. Louise McFarland, PhD, the epidemiologist for the Office of Public Health, testified that HIV is contracted through the exchange of bodily fluids, such as blood, from males' seminal fluid or semen, and from female vaginal fluids and breast milk. She stated that, from the information given to her, when plaintiff was examined at Charity Hospital, rectal and oral swabs were taken and there was no evidence of blood or semen. Further, there was no tearing of the anal tissue. She said that it would have been *711 difficult for plaintiff to have acquired the virus without the presence of blood or semen, but that internal tears can occur with anal sex and that is why it is a likely means of transmitting the disease. Nonetheless, Dr. McFarland concluded that there was no way to know for sure if plaintiff got AIDS from the attack.
After our review of the evidence, we find that plaintiff proved, more likely than not, that he contracted AIDS from the rape. Three doctors testified that plaintiff could have had internal tears which is a primary way to contract the disease. Furthermore, plaintiff did not engage in any of the other risk-taking activities which produce AIDS. Although he was treated for injuries he received in fistfights, the evidence indicated that it was unlikely that plaintiff would have gotten the disease in that manner. Therefore, we find that the rape caused plaintiff to contract AIDS and other injuries and plaintiff is therefore entitled to an award of damages.

GENERAL DAMAGES AND FUTURE MEDICAL EXPENSES[5]
Plaintiff testified that he was hurt and bruised for a week following the abduction and rape. He was and is embarrassed and humiliated by the experience. He stated that he obtained psychological treatment, but did not make any progress with Dr. William Janzen or Dr. Walter Sanders because he has difficulty talking about the incident and its drastic results. Although he kept working after the incident, he was very depressed. Plaintiff said that he drinks alcohol, but not all the time. However, when he does drink alcoholic beverages, he now drinks heavily because of the AIDS diagnosis. Plaintiff testified that he got a cold in 1995 and lost 30 pounds in two weeks. He has not put back on the weight. He noted that he is on a regimented system of medications: seven pills in the morning, five pills eight hours later and three pills in the evening. He drinks a bottle of bad-tasting chalky medication once a week and is examined at an AIDS clinic once a month. His medications give him headaches and diarrhea, but help some.
Plaintiff testified to his work history. At the time of the incident, he worked for a company that owns several shops, including shoe stores and he managed one of the shoe stores. At the time of the trial, he was working for Dillard's Department Store (Dillard's).
Plaintiff responded to questions about why his watch was not listed as one of the stolen items after the abduction. He said that, if he failed to list his watch as stolen when he listed the other items of jewelry in the police report and when questioned later, he must have forgotten it. However, he thought that he told the police about the watch. It was apparent, however, that plaintiff was dazed for some time after the incident and his immediate memories following the incident were foggy.
Plaintiff said that he dated women and that he recently started dating Debbie Eubanks again. He would like to marry and have children, but cannot because of the disease. He has no brothers and one sister. Plaintiff testified that he feels terrible emotionally. He feels that his life is over.
Debbie Eubanks testified that since the abduction, plaintiff is moody, drinks more alcohol than he should sometimes and is generally depressed. She and plaintiff would have liked to marry, but cannot because of plaintiff's illness.
Plaintiff's mother, Marion Peterson (Mrs. Peterson), testified that she found out about the incident when she was at work. She worked for Holmes Beauty Salon and went to work that morning at 7:30 a.m. Plaintiff telephoned her. He did not know where he was and the security guard at Uptown Square Shopping Center had to explain. When she arrived, plaintiff was in a daze and incoherent. He was bloody and black and blue. Mrs. Peterson testified that, "The fear in my son's eyes, you should have seen it." She said that plaintiff cried hard all the way to the hospital. He could not talk about the abduction and rape. At the hospital, she spoke to a chaplin and to the police. However, her son was too distraught to talk *712 to the police. Mrs. Peterson notified The Galleria later that day about these events. She testified that plaintiff told her about the loss of his wallet, jewelry and his watch. After they went home, plaintiff stayed with Mrs. Peterson for two weeks. At that time, he was living in an apartment, but he has since moved back with his mother. During the first two weeks, plaintiff had trouble sleeping and would wake up screaming or crying. He was very depressed. Plaintiff stayed home from work one week. Mrs. Peterson stated that plaintiff did not want anyone to know about the rape and would not talk about it. He still does not want to talk about it with anyone. He wants to forget it and said to her that no one should have to go through what he did. Mrs. Peterson testified that, before the incident, plaintiff was happy-go-lucky, loved to bowl, go to concerts and go out drinking socially. Mrs. Peterson described their reactions when plaintiff found out he had AIDS. She said they both were "in a state of shock." Mrs. Peterson stated that plaintiff has never been the same since. She confirmed plaintiff's testimony that he gave blood in 1986 for a friend who was having surgery.
Dr. Marier testified that plaintiff's life expectancy was 5 to 10 years. But, as the disease progresses, he will get infections more frequently, to the point where, in the last few years, he will be in and out of the hospital and not able to work. The doctor listed numerous types of infections to which plaintiff will be susceptible, many of which are unheard of in the general population. They include severe chronic pneumocystis carinii pneumonia, a type of meningitis, fungal types of infection and viral infections, one of which causes severe and disabling diarrhea for extended periods of time. Other symptoms include progressive respiratory insufficiency, shortness of breath, air hunger, restlessness, inability to exercise or to do anything. Paralysis may result, with a loss of mental ability and vision. There may be wasting of the body, weakness and weight loss. Some of the infections affect the mouth and make it difficult to swallow or take medications. The doctor stated that for some patients, the illness is very, very difficult and protracted. In addition, the disease is associated with a long list of certain types of cancer.
At the time of trial, Dr. Marier stated that plaintiff's medications were having less effect. In addition, the drugs used to treat AIDS victims and plaintiff have serious side effects, such as bone marrow suppression causing low platelet count and bleeding, impairment of the liver and kidney, and neurologic functions. At the time of trial, plaintiff's drug therapy averages $1,000 per month. The newest medications cost $2,500 per month. The doctor testified that plaintiff's hospitalization costs for the last few years of his life will be approximately $50,000 per year. Dr. Marier estimated that plaintiff will incur three years of hospitalization before death, for a total of $150,000.
Dr. Sanders, a psychiatrist, testified that he saw plaintiff first on October 8, 1991 and five times thereafter. Plaintiff was depressed and expressed his anger and humiliation over the incident. He informed the doctor that he drinks more and was edgy for a period of time. He does not like to talk about the incident, is anxious when he thinks about it and sometimes is prejudiced towards black people because of his experience. After the incident, plaintiff sometimes went driving in the uptown area with a gun. The doctor tested plaintiff for anxiety and depression. The test results were normal. Nonetheless, given his experiences and history, Dr. Sanders diagnosed plaintiff with posttraumatic stress disorder. Plaintiff was seen again by Dr. Sanders after being diagnosed with HIV. The doctor felt that plaintiff was slowly having less anxiety and stress related to the abduction when he was diagnosed with the disease. Now, plaintiff is having difficulty dealing with his illness. At the time of trial, plaintiff was doing as well as he is going to do. The doctor stated that plaintiff needs supportive therapy from time to time. He said that financial considerations have prevented plaintiff from attending therapy regularly. Dr. Sanders stated that, if he saw plaintiff three times per week, the cost would be $135 per week.
Dr. Richard Roniger, a psychiatrist, testified that he examined plaintiff twice, once in *713 February of 1992 and once in September of 1996. Based on his examination and review of plaintiff's records with Dr. Sanders and Dr. Janzen, he concluded that plaintiff was not suffering from post-traumatic stress syndrome or psychiatric illness. He noted that plaintiff told an internist in August of 1988 that he was fine.
Dr. Janzen, a psychologist, saw plaintiff in August of 1988. Plaintiff told Dr. Janzen that the incident did not bother him too much, and that he was not dwelling on it. Dr. Janzen saw plaintiff again in September of 1988, April of 1990, May of 1990 and June of 1990. Dr. Janzen related that plaintiff reported that he did not have flashbacks, panic feelings, nightmares, change in socializing, recreation or work. However, he was angry that the perpetrators had not been caught. In spite of different psychiatric testimony, we feel that plaintiff, more probably than not, will need psychiatric treatment once a week for life.
Carol Pindaro, RN (Pindaro) and nurse practitioner, testified as an expert in field of HIV and AIDS treatment. She also treats plaintiff for his condition at the clinic in Charity Hospital. Plaintiff has been treated there since 1995, when he caught a cold and lost 30 pounds. Pindaro described the medications given to plaintiff and their costs: D4T and Saquinavir (anti-viral drugs), $193 and $550 per month respectively; Nizoral (to help absorption of Saquinavir) $191 per month; Zithromax (to prevent an infection common to those with low CD4 counts) $31 per month; and Dapsone (to prevent pneumonia) $10 to 20 per month. The total is $975 to $985 per month. Pindaro testified that Zithromax is a chalky mixture with a bad taste. She stated that eventually the patients get so sick from the medications that they cannot use them in the necessary doses, so the patient gets sick with an opportunistic infection. The nurse testified that the patients suffer a great deal. She agreed with Dr. Marier about plaintiff's life expectancy and ultimate hospitalization.
We find that plaintiff is entitled to general damages for past, present and future physical and mental pain and suffering of $4,000,000. We find that plaintiff is entitled to future medical expenses and they are itemized as follows:

Hospitalization (3 years) ..............$150,000
Drugs...................................$ 87,750[6]
Psychiatric Therapy.....................$ 52,650[7]
 ____________
TOTAL FUTURE MEDICAL EXPENSES..... $290,400

LOSS OF WAGES
Plaintiff withdrew his claim for past lost wages during trial. Dr. Mel Wolfson, an expert forensic economist, testified to plaintiff's future lost wages using both a ten and five year work-life. He stated that plaintiff was presently earning approximately $15 per hour or $31,180 per year at Dillard's. If plaintiff were to survive ten years, with three of those years being disabled from working (or seven years of work-life), he would need $73,933 available to him for the three years of disability. Dr. Wolfson stated that these amounts are calculated based on the assumption that plaintiff could invest that amount at seven per cent interest to avoid drawing on the principal and that earnings growth is about five per cent per year. Based on the evidence, we find that plaintiff is entitled to future lost wages in the amount of $73,933.
There were numerous defendants named in this case, but only Gibraltar, FGMC, Ltd., Metaire Center Phase 1 and NOPPS answered the suit, participated in the trial and were dismissed in the judgment. The remainder of the defendants were never mentioned in the trial. However, during the trial, defendants asked for these parties to be dismissed. Because there was some concern about the ownership and control of the building, the trial judge did not dismiss them, but the jury was not asked to determine their liability. Since the liability of these 56522 defendants are not an issue in this appeal, they will be dismissed by this court.

APPORTIONMENT OF FAULT
In regard to the other defendants, FGMC admitted ownership interest in The Galleria in one of its answers and Metaire Center Phase 1 admitted executing the security *714 contract with NOPPS. Thus, they were, at least, the operators of The Galleria at the time of this incident. Furthermore, Michael Hilferty, the manager of the building at the time, testified that, to his knowledge, Gibraltar was the owner at the time. It also came out that Gibraltar was placed in receivership in 1990, but the receiver was not substituted as a defendant. Nonetheless, we apportion fault as follows: 80% to defendants, Gibraltar Savings and Loan, FGMC Investment Corporation, FGMC, Ltd., Metairie Center Phase 1, Metairie Center Phase 1, Ltd.,Reliance Insurance Company,[8] and 20% to New Orleans Private Patrol, Inc. and New Orleans Private Patrol Services, Inc. We apportion no fault to plaintiff.

THIRD-PARTY DEMAND
Metairie Center Phase 1, Ltd., Gibraltar Savings and FGMC Investment filed a thirdparty action against NOPPS, for indemnification or contribution under the security contract in the event they are found liable. During the trial, Metairie Center Phase 1, Ltd. dismissed its demand. However, it was not noted that the other two third-party plaintiffs did so, although counsel for Metairie Center Phase 1, Ltd. also represented the other two third-party plaintiffs. In an abundance of caution, because the contract was not introduced into evidence and no other proof was submitted in to support this claim, the entire third-party claim against New Orleans Private Patrol, Inc. and New Orleans Private Patrol Services, Inc. will be dismissed, with prejudice.

EXCEPTIONS AND OBJECTIONS
During the trial, on December 16,1996, New Orleans Private Patrol, Inc. and New Orleans Private Patrol Services, Inc. filed exceptions of prescription, non-joinder of indispensable party, objection to the trial on the basis that it did not receive notice of the trial date, and objection to the trial judge's denial of its' Motion for Continuance. The judgment rendered by the trial judge is silent on these issues. When the judgment is silent as to a claim, it is presumed that the trial judge denied it. Defendants did not appeal this finding, but we note this because we should affirm the judgment in this respect in order to avoid confusion in the reversal of the judgment on liability.
Accordingly, the denial of the motion for JNOV is reversed and the judgment of the trial court is hereby reversed as to the liability of the following defendants. We hereby render judgment in favor of plaintiff in the proportion of 80% against defendants, Gibraltar Savings and Loan, Gibraltar Savings, FGMC Investment Corporation, FGMC, Ltd., Metairie Center Phase 1, Metairie Center Phase 1, Ltd, Reliance Insurance Company and in the proportion of 20% against defendants, New Orleans Private Patrol, Inc. and New Orleans Private Patrol Services, Inc., in the amount of $4,364,333[9] with legal interest from date of judicial demand until paid, plus court costs, including expert witness fees in the amount of $500 for Dr. Mel Wolfson, $200 for Dr. Robert Marier, $300 for Dr. Walter Sanders, $200 for Dr. Charles Preston, $200 for Dr. Louise McFarland and $100 for Carol Pindaro.
We further dismiss all claims herein against the following defendants, with prejudice: Club West, Inc., Club Galleria West, Inc., Galleria Investment Corporation d/b/a/ Galleria One and/or The Galleria, Metairie Center Land Development, Ltd., Galleria Land, Ltd., First Gibraltar Mortgage Corporation, Inc., Metairie Center Joint Venture, Metairie Center Land Joint Venture, Galleria Phase One, Ltd. and Metairie Corporation of Texas.
*715 WE FURTHER RENDER JUDGMENT in favor of third-party defendant, New Orleans Private Patrol, Inc. and New Orleans Private Patrol Services, Inc. and against third-party plaintiffs, Metairie Center Phase 1, Ltd., Gibraltar Savings and FGMC Investment, dismissing the third-party demand, with prejudice, and at third-party plaintiffs' costs.
The judgment is otherwise affirmed.
Costs of this appeal are to be paid by defendants.
REVERSED IN PART, AFFIRMED IN PART AND RENDERED IN PART.
NOTES
[1] The following defendants were named in the suit and alleged to be the owners and/or operators of The Galleria: Gibraltar Savings and Loan, Club West, Inc., Club Galleria West, Inc., Galleria Investment Corporation d/b/a/ Galleria One and/or The Galleria, John Doe, Charles Roe, Metairie Center Land Development, Ltd., Galleria Land, Ltd., FGMC Investment Corporation, First Gibraltar Mortgage Corporation, Inc., Metairie Center Joint Venture, Metairie Center Land Joint Venture, Galleria Phase One, Ltd., Metairie Corporation of Texas, Reliance Insurance Company and Metairie Center Phase I, Ltd.

Although there was some discussion during trial about dismissing all of the defendants, except for Gibraltar, Metairie Center Phase 1, FGMC Investment Corporation and NOPPS, no dismissal was ordered. In addition, the interrogatories given to the jury only mentioned Gibraltar and NOPPS. However, in the judgment, the trial judge included Metairie Phase 1 and FGMC, Ltd. Consequently, we must determine the status of all of the defendants and render judgment accordingly.
[2] AIDS is a clinical syndrome characterized by a progressive HIV infection and the development of certain opportunistic infections.
[3] At the time of trial, his life expectancy was five years.
[4] Specifically, he argues that, A) plaintiff was denied a full and fair voir dire, B) the trial judge allowed the testimony of witnesses who were not made available to be deposed, but who suddenly appeared at trial, C) the trial judge erred in refusing to allow plaintiff to reveal to the jury the crime statistics for the entire year of 1988 and the occurrence of other rapes in the year 1988 following the incident herein, and D) the trial judge erred in restricting relevant testimony of plaintiff's fact witness regarding the controversial nature of The Galleria.
[5] Plaintiff produced no evidence of past medical expenses.
[6] $975 per month × 12 months × 7.5 years = $87,750.
[7] $135 per week × 52 weeks × 7.5 years = $52,650.
[8] In the trial and judgment, the parties and trial judge refer to The Galleria defendant only as Gibraltar. However, the judgment dismisses Gibraltar Savings and Loan, FGMC, Ltd., Metairie Center Phase I and New Orleans Private Patrol, Inc. The record reflects that these companies referred to themselves, at various times, as we have listed them in the decree. The same counsel represented The Galleria group throughout the proceedings, as did the counsel for NOPPS. Counsel for NOPPS acted on behalf of and responded to the names of both New Orleans Private Patrol, Inc. and New Orleans Private Patrol Services, Inc. Thus, all the names are included in our decree, to insure that all the proper defendants are included in the judgment.
[9] $4,000,000 (general damages) + $290,400 (future medical expenses) + $73,933 (future lost wages) = $4,364,333.