JiDUFRESNE, Judge.
This is an appeal by' Morteza Shamsnia, plaintiff-appellant, from an adverse judgment in this automobile rear-end collision case. The jury found that Maxine Barrocas, defen *1052 dant-appellee, was negligent in running into the rear of plaintiffs car, but further found that the accident was not the cause of plaintiffs lower back problems. Because we find no manifest error in the jury’s factual deter-minátion that plaintiffs spinal difficulties were not caused by the incident, we must affirm the judgment.
Plaintiff urges here that the jury was simply wrong in finding no connection between the accident and his lower back problems. Because this is a factual issue, the applicable standard of review is whether the finding was manifestly erroneous or clearly wrong. In Stobart v. State through DOTD, 617 So.2d 880 (La.1993), the court reiterated that application of the manifest error standard involves a two |2part inquiry for reversal of a factual finding. The reviewing court must first determine that a reasonable factual basis does not exist for the trial court finding. The court must then further determine that the entire record establishes that the finding is clearly wrong. Also, when there is conflicting evidence, the fact-finder’s reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the reviewing court may have made other choices had it been sitting as the trier of fact, Id. Finally, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly wrong, Id.
The evidence presented at trial was as follows. The accident occurred in the left westbound lane of 1-10 just west of the 1-10 and 1-610 merge in Jefferson Parish, on the down side of the Oaklawn overpass. It was at about 5PM on a weekday, and the investigating officer testified that there was typical rush-hour traffic at the scene. Plaintiffs version of the accident was that traffic was flowing at about 40 MPH when the ear in front of him slowed. He said that he touched his brakes and slowed down a bit. He looked in his rear view mirror and observed that Barrocas was not paying attention, had not slowed down, and was obviously going to hit him in the rear. At that moment, the car in front of him sped up and was pulling away, so he released his brakes, reasoning that the impact would not be so severe if his car moved forward when struck. After impact his car continued to move forward a bit and he applied the brakes again and stopped. His rear bumper was bent and a tail light was broken, but there was ^apparently no other damage to the car. Plaintiff said he observed that defendant’s front grille was damaged and he thought that her radiator was leaking.
A passenger with plaintiff, Bahram Khoob-ehi, testified similarly. This witness said that they were traveling 30-40 MPH and slowed to 20-30 MPH right before the impact. He further noted that defendant had to be traveling faster than they, or otherwise the accident could not have happened. He saw plaintiffs bent bumper and defendant’s damaged grille, and also thought that her radiator was damaged.
Defendant gave a quite different version of the incident. She said that the traffic was bumper-to-bumper and stop-and-go, as it typically is during rush hour. She testified that she could also see what appeared to be an accident about a half mile farther on in the left lane. She said that she had her foot on the brake and when plaintiffs car crept forward she would simply release the brake and her car would move forward because of the down-slope of the overpass. Just before the impact she said that she looked over her right shoulder to see if she could safely move into the center lane, and her foot came off of the brake. At that point her car rolled forward and struck plaintiffs car, which she believed was then stopped. She noted only that plaintiffs tail light was broken and that her grille was damaged, but she denied that the radiator was punctured.
Plaintiff told the investigating officer at the scene that he was not injured, but testified that later that night he began suffering back pains which persisted for several days and then gradually diminished. |4He noted, however, that he had developed a numbness on the inside portion of his right foot and his big toe, and still had residual pain in his hip and back. Plaintiff is a neurologist affiliated with a major medical center, and conducts between 700 and 1,000 EMG tests per year. He testified that because of his expertise, he knew that there was probably some nerve *1053 problem causing the numbness. Some nine days after the accident, on July 21, 1993, he consulted with an associate neurologist, Dr. Elizabeth Bouldin.
This physician testified that on examination she found right paraspinous muscle spasms, and also noted weakness in the right big toe with some sensory loss in that toe and along the inside of the foot. Ankle reflexes were weak, but symmetrical. Her impression at the time was radiculopathy, possibly involving an L5-S1 disc, with a history of abrupt onset after trauma. She further stated that although the tests for the weakness and numbness in the toe and foot were to a large extent subjective, i.e. dependent on what the patient said he felt, she also thought that there was an objective element in these findings. No medications were prescribed, but an EMG and MRI were recommended. The MRI was done on July 26, 1993, but she never saw the result of this test, which was originally interpreted as being normal, and never treated plaintiff again.
During the following eleven months, plaintiff did not see any other doctor. Instead, he used over-the-counter medications and samples of some prescription drugs which were available to him because of his position at the medical center to treat his alleged discontinuing pain. On June 27, 1994, he had an EMG done. The results of this tests were deemed normal, except for an abnormality in the tibialis anterior muscle, which finding was interpreted as a SI nerve’ root problem.
Two months later, on August 31, 1994, plaintiff saw Dr. Wilmot Ploger, an ortho-paedic surgeon, and the only treating physician with whom he had no personal or professional relationship. Plaintiff related the history of his problems, including the impressions of Dr. Bouldin, and related also that the recent EMG was positive for SI radiculo-pathy. Dr. Ploger took x-rays which showed a narrowing of the lumbosacral disc spaces, probably related to the aging process, but which were otherwise normal. Straight leg raising test was normal as were reflexes, and no muscle weakness was found. This exam was basically normal.
On September 16,1994, plaintiff again saw Dr. Ploger, and the examination was unchanged from the previous visit. Another MRI disclosed no problems which would explain plaintiffs symptoms. On neither of these visits did the doctor check for sensory loss in the toe and foot.
Some eight months later, on May 24,1995, plaintiff returned to Dr. Ploger complaining of continuing pain. Straight leg raising test was still negative and reflexes were equal. However, there was some decreased sensation in the big toe and some sensory loss, with tenderness in the lower back. The symptoms were described as subjective complaints. During the three visits, Dr. Ploger did not seejjthe first EMG study, or the one made after his last visit with plaintiff, but before trial. He did testify, however, that he had heard other physicians describe these tests during their trial testimony. His ultimate impression as to plaintiffs pains was irritation of the L5-S1 nerve roots.
Less than two weeks later, on June 5, 1995, plaintiff saw another associate, Dr. Leon Weisberg, a neurologist. He repeated his history to this doctor, including the findings of Dr. Bouldin. Dr. Weisberg found no evidence of nerve root impingement,in the July, 1993, MRI, but did note narrowing of the disc spaces at the L2-L5 levels. He attributed these findings to the aging process, and did not think that they related to a trauma occurring only a few weeks before the test. Straight leg raising test was now positive at 45 degrees, there was some loss of sensation, and ankle reflexes were weak, more so on the right, but there was no weakness in the big toe. He noted that typically nerve root problems which cause muscle weakness do not wax and wane, but generally remain constant. His only explanation for this latter finding was that the nerve may have healed from the time of Dr. Bouldin’s examination. His impression was irritation of the nerve roots at L5 and SI, with which the EMG of July, 1994 was consistent. A second examination of July 14, 1996, was similar to the first.
As to causation, this physician stated that if plaintiff had no pains before the accident and had pains after the accident, then the reasonable explanation was that the accident *1054 caused the problems. He Ualso wrote in his notes that the abnormalities in the disc spaces shown in the 1993 MRI makes “the spine unstable and will predispose to the area that is maximally stressed, which is the L5 — the nerve root L5 and SI.” Elsewhere in his testimony in regard to these same disc spaces which had shown up in the first MRI, the following exchange took place:
Q. ... Did you consider the findings on the MRI to be a normal variance of someone of Dr. Shamsnia’s age, or did you consider some of that to be traumatically induced by the accident directly?
A. There’s no way to know that, because I have not — to know where you’re going, you’ve got to know where you’ve been.
Q. Right.
A. All I can tell you is that Dr. Shamsnia is symptomatic from this.
On cross examination he admitted that other types of physical activity could well have caused the symptoms complained of, but reiterated that if plaintiff was pain free before the accident, but had pain after it, then the accident must have caused the problems.
A second EMG study was done on July 26, 1996, by Dr. Sarala Palliyath, another neurologist of plaintiffs acquaintance. This doctor testified that she reviewed the original EMG of July 27, 1994, and interpreted it to be normal as to nerve conduction studies. She did notice, however, that the H-reflex, which she related to the ankle reflexes, was marked on the right side indicating an SI nerve root involvement. She also noted the finding relating to the tibialis anterior muscle, and said that it indicated some involvement of the L5 nerve root. The later EMG showed worsening of several areas, all of which |Rthis doctor associated with the L5-S1 nerve roots. On cross examination, she admitted that the figures for the right and the left H-reflexes were within normal limits, but explained that the figures for the right and the left varied as between each other, and it was this variance which was significant.
The defense called Dr. Richard Levy, a neurosurgeon who examined the records of all treating physicians and the various test results. He noted that based on the second MRI there was narrowing of the disc spaces due to water loss at the L3^1, L4-5, and L5-S1 levels, but no herniation. He further stated that while trauma might cause such a condition in one disc, or possibly two, such and injury to three disc was unheard of. His opinion was that far and away the most probable cause of the narrowing was the natural aging process.
As to other reports examined, he gave no credence to the finding in the first EMG of a right SI nerve problem based on abnormalities in the tibialis anterior muscle because that muscle is actually served by a nerve originating at the L4-L5 level. He also discounted the association of the SI nerve with the H-reflex abnormality because in his opinion it was not a strong positive finding implicating a particular nerve root. The second EMG he did find consistent with nerve root problems, but had no explanation for what could be causing this. He ruled out any compression of the roots or herniated discs as a source of the symptoms. He also explained that objective findings are those that do not depend on the patient’s responses, but rather depend on what the examiner can discover by observation or feel. Of all of the ^findings made by various doctors the only ones which he thought were objective were the finding of muscle spasm in the paraspi-nous region reported by Dr. Bouldin some nine days after the accident, and the similar spasms and right ankle reflex slowness found by Dr. Weisberg two years after the accident.
The above summary clearly shows that there was conflicting evidence as to the accident and as well as to whether it caused plaintiffs alleged injury. Plaintiffs version involved a collision between vehicles traveling 20-30 MPH, while defendant said that plaintiff was stopped and that she merely bumped him from the rear.
The first doctor plaintiff consulted nine days after the incident found muscle spasm and weakness and loss of sensitivity in the toe and foot. No difference was found in the ankle reflexes. Plaintiff next saw Dr. Ploger a year after the accident, and this doctor found no loss of strength in the toe, no reflex problems, and negative straight leg raising. *1055 He did note narrowing of the disc spaces in the lumbosacral region of the back which he ascribed to normal aging. An MRI was done which did not show anything to explain plaintiffs complaints, and a second examination two weeks after the first produced the same normal findings. Eight months later, and almost three years after the accident, plaintiff returned to Dr. Ploger, and some weakness in the toe and decrease in sensation in the foot was noted. These findings were considered subjective by Dr. Ploger. Also at that time reflexes were equal on both sides, and straight leg raising was negative.
Some ten days later plaintiff saw Dr. Weis-berg who found |10straight leg raising positive at only 45 degrees, but no weakness in the toe. This doctor also stated that it is not usual for nerve damage producing muscular weakness to wax and wane as plaintiffs symptoms seemed to be doing. He also noted the disc space narrowing and said that the instability in the back was the underlying source of the L5-S1 problems, and plaintiffs symptoms could have been triggered by any stressful activity. His only basis for making the connection between the accident and the symptoms was the history given him by plaintiff. Dr. Palliyath testified that she found asymmetrical readings in the ankle reflexes in the July, 1994, EMG, but both Drs. Bouldin and Ploger repeatedly found symmetrical reflexes in the ankles. Dr. Levy stated that the disc narrowing at three levels could not have been caused by trauma, but was most probably the result of aging. A reasonable view of this evidence could lead to factual determination that the defendant’s version of the accident was what actually happened and that plaintiff was grossly exaggerating the impact. Further, if plaintiff was not found credible in that regard, than his further testimony that he was pain free before the accident and only began to suffer in his back afterwards could equally be rejected. The medical evidence, especially that presented by Dr. Weisberg, indicated that there was narrowing in the disc spaces causing instability, that this narrowing was not the result of trauma, but rather of aging, and that plaintiff’s symptoms were at least related to the instability. It would be equally reasonable, in light of Dr. Ploger’s basically normal findings over a year after the accident, to conclude Inthat the results of the second EMG, done three years after the accident, revealed problems that arose during those years, rather than as a result of the accident. Because these findings are reasonable ones based on the entire record, the jury’s ultimate finding that the accident did not cause plaintiff’s back problems is equally reasonable. As such, that finding is not manifestly erroneous, and therefore we cannot set it aside.
Plaintiff argues, to the contrary, that the jury erred in apparently not following the instruction relating to causation. Specifically, he asserts that when a tort victim is in good health before an accident and his symptoms appear after the accident, then there is a presumption that the injuries resulted from the accident, provided that the medical evidence establishes a reasonable possibility of causation, citing Maranto v. Goodyear Tire & Rubber Co., 94-2603, 94-2615 (La.2/20/95), 650 So.2d 757. The defendant is then required to go forward with evidence to show some other incident which could have caused the injury. While that is a correct statement of the law, there is nonetheless a threshold requirement that the plaintiff be found healthy before the accident in question.
In the present matter, Dr. Weisberg associated the narrowing disc spaces with plaintiffs problems and testified that this condition could not have developed between the time of the accident and the first MRI of a few weeks later. Further, aside from one objective finding of muscle spasm by Dr. Bouldin shortly after the incident, there is no objective evidence of continuing injury to plaintiff other than his | i2own testimony until at least the EMG of June 27, 1994, and even the most pertinent finding of that test which related to asymmetry in the ankle reflexes was disputed by the findings of Drs. Bouldin and Ploger. Considering this conflicting evidence as to the time and nature of plaintiff’s complaints, we must conclude that the jury’s determination as to causation was not manifestly erroneous.
*1056 For the foregoing reasons, the determination by the jury that the accident did not cause plaintiffs injuries is hereby affirmed.

AFFIRMED.