747 So.2d 212 (1999)
Donald J. OUBRE and Jeanine V. Oubre
v.
UNION CARBIDE CORPORATION.
No. 99-CA-63.
Court of Appeal of Louisiana, Fifth Circuit.
December 15, 1999.
Rehearing Denied January 14, 2000.
*217 Dominic J. Gianna, John D. Person, Michele A. Engnath, New Orleans, Attorneys for Appellant.
Leonard Cardenas, III, John T. Joubert, Baton Rouge, Attorneys for Appellees.
Panel composed of Judges H. CHARLES GAUDIN, CHARLES GRISBAUM, Jr. and MARION F. EDWARDS.
EDWARDS, Judge.
Defendant/Appellant Union Carbide Corporation appeals the judgment of the trial court awarding general, special, and exemplary damages to plaintiffs/appellees Donald and Jeanine Oubre. For the following reasons, we affirm in part, reverse in part and amend the judgment of the trial court.

STATEMENT OF FACT
The incident in dispute took place on July 28, 1994 at the Union Carbide facility in Taft, Louisiana. Plaintiff Donald Oubre was a draftsman employed by Jacobs Engineering (hereinafter "Jacobs"). Defendant Union Carbide contracted with Jacobs to update all of its piping and instrument diagrams ("P & ID's") at the Taft facility by May 26, 1997, in compliance with OSHA regulations.
*218 On the date in question, the plaintiff was performing his duties in proximity to the 2 to 1 BIRD centrifuge in the Amines Unit of the facility. The plaintiff alleges that the reslurry motor valve located on the ground level below the BIRD centrifuge was leaking. According to the plaintiffs testimony, he was "gassed" by the amine fumes that were emitted from this leak in the valve. The gas burned his eyes as well as irritating his nose and throat. He informed his co-employee, Clay Rodney, of the incident and then reported to Cameron Calliouet, a Union Carbide technician. After reporting the leak to Mr. Calliouet, the plaintiff then informed his supervisors of the incident.
Mr. Calliouet inspected the 2 to 1 BIRD centrifuge and the motor valve immediately after the plaintiff reported that he had been "gassed." He testified that he did not find a leak in the centrifuge or the valve.
The plaintiff returned to work on August 1, 1994. He was once again scheduled to work in the Amines Unit. Upon entering the unit, he experienced nausea and irritation to his sinuses. He left the unit and reported these symptoms to his supervisor, Steve Hollowell, and to Union Carbide technicians Cameron Calliouet and Michael Parker. He was informed by Mr. Parker that he was experiencing symptoms of "amines crud" and that it would soon pass. However, the plaintiff was not sent back to the Amines Unit.
The plaintiffs health continued to deteriorate as he experienced the symptoms of the "amines crud." He suffered from a bad cough as well as sinus problems which included a post-nasal drip and nasal congestion. On August 11, 1994, the plaintiff was sent to the Union Carbide dispensary. An incident report was prepared by an investigative team composed of Union Carbide and Jacobs personnel. This report listed the most probable root cause of the plaintiffs sickness as "a leak from the seal of the Two to One Bird centrifuge and/or a leak from the packing of the reslurry DMV." Also included in the report was a statement from Union Carbide employee Paul Ory, who indicated that there was leaking from the stem packing on a reslurry DMV that was to be fixed soon.
On August 15, 1994, a Union Carbide injury report was completed by Jacobs' project manager, William Vallier. The cause of the injury was listed as inhalation due to faulty equipment. This report was signed by Union Carbide engineer James Riley.
In November, 1994, the first of two sinus surgeries was performed on the plaintiff by Dr. Stanley Peters. A second surgery was later required to remove scar tissue that had developed around the nerve and was causing extreme pain to the plaintiff.
The plaintiffs filed suit against Union Carbide on May 3, 1995. The petition alleged that the defendant was not only negligent in its safety precautions, but was also strictly liable for the injuries suffered by the plaintiff. Furthermore, the petition alleged that the defendant acted with wanton and reckless disregard for the safety of the plaintiff in the handling of hazardous substances. The plaintiffs prayed for both general and special damages due to physical and emotional pain and suffering on behalf of plaintiff Donald Oubre. The plaintiffs also prayed for loss of consortium damages on behalf of plaintiff Jeanine Oubre. Finally, the plaintiffs prayed for exemplary and punitive damages against defendant Union Carbide for its wanton and reckless disregard in the handling of hazardous substances.

ACTION OF THE COURT
The matter was tried before the Honorable Ralph Tureau of the Twenty-Third Judicial District Court from October 21 through October 30, 1997. The matter was then taken under advisement. The trial court rendered its judgment with reasons on February 19, 1998. The plaintiffs *219 were awarded the following in damages against defendant Union Carbide:

General damages: $ 700,000.00
Special damages: $ 457,746.33
Loss of consortium: $ 45,000.00
Punitive/exemplary damages: $1,000,000.00

The trial court did not award the plaintiff for the loss of insurance/fringe benefits in the requested amount of $23,900.00.
The defendant filed a motion for suspensive appeal on March 23, 1998. The plaintiffs filed an answer to the appeal on January 21, 1999. The matter is now before this Court for review.

LAW AND ANALYSIS
In its appeal, defendant Union Carbide has alleged eight assignments of error for this Court to review. In its first assignment of error, defendant alleges that the trial court erred in finding that it was not the statutory employer of the plaintiff. In its second assignment of error, defendant alleges that the trial court erred in finding the plaintiffs testimony to be credible. In its third assignment of error, defendant alleges that the trial court erred in finding that the plaintiff was exposed to amines at the Taft facility on the date in question. In its fourth assignment of error, defendant alleges that the trial court erred in finding that the plaintiffs sinus surgery was a direct result of an exposure to amines at the Taft facility on the date in question. In its fifth assignment of error, defendant alleges that the trial court erred in finding it negligent. In its sixth assignment of error, defendant alleges that the trial court erred in finding it strictly liable in the absence of any evidence of a defect in the 2 to 1 BIRD centrifuge. In its seventh assignment of error, defendant alleges that the trial court erred in finding it liable for exemplary/punitive damages in the absence of any evidence of wanton or reckless disregard for public safety in the storage, transportation or handling of a hazardous or toxic substance. In its eighth and final assignment of error, defendant alleges that the trial court erred in its quantum award of damages.
The plaintiff has filed an answer to this appeal. In the answer, the plaintiff alleges that the quantum damages awarded by the trial court were abusively low. Furthermore, the plaintiff alleges that the trial court erred in failing to award the present value of future insurance/fringe benefits that he lost because he is unable to return to regular employment.

Standard of Review
An appellate court may not set aside a trial court's or jury's findings of fact in absence of manifest error or unless it is clearly wrong. Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The Supreme Court has stated the two-tier test for reversal on appellate review as follows:
1) [t]he appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Lewis v. State Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311. Therefore, absent a determination by this Court that a reasonable factual basis does not exist for the finding of the trial court and that the finding is clearly wrong, we will not reverse the trial court's ruling.
A reviewing court must keep in mind that if a trial court's or jury's findings are reasonable based upon the entire record in evidence, an appellate court may not reverse the findings even if it is convinced that had it been sitting as trier of fact it would have weighed evidence differently. Lewis, supra. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions *220 between the respective courts. Stobart, supra at 883. Furthermore, as the Supreme Court stated in Rosell, "[o]nly the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said."

Assignment of Error One
The first issue raised by the defendant on appeal is the issue of statutory employment. The exclusive remedy of an employee against his employer for work-related injury is set forth in the Louisiana Workers' Compensation statute. LSA-R.S. 23:1032(A), prior to its 1995 amendment, read in pertinent part as follows:
(1)(a) The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, as against his employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal, for said injury, or compensable sickness or disease.
(b) This exclusive remedy is exclusive of all claims, including any claims that might arise against his employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal under any dual capacity theory or doctrine.
(2) For purposes of this Section, the word "principal" shall be defined as any person who undertakes to execute any work which is a part of his trade, business, or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for execution thereof.
The exclusive remedy provided for under the Workers' Compensation statute extends to statutory employees working for a principal employer. LSA-R.S. 23:1061(A), prior to its 1997 amendment, read in pertinent part as follows:
"When any person, in this Section referred to as the `principal', undertakes to execute any work, which is a part of his trade, business, or occupation or which he contracted to perform, and contracts with any person, in this Section referred to as the `contractor', for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed. The fact that work is specialized or nonspecialized, is extraordinary construction or simple maintenance, is work that is usually done by contract or by the principal's direct employee, or is routine or unpredictable, shall not prevent the work undertaken by the principal from being considered part of the principal's trade, business, or occupation, regardless of whether the principal has the equipment or manpower capable of performing the work."
The defendant alleges that the plaintiff was its statutory employee as defined under LSA-R.S. 23:1061 and the Supreme Court case of Kirkland v. Riverwood Intern. USA, Inc., 95-1830 (La.9/13/96), 681 So.2d 329. If the plaintiff was a statutory employee, as the defendant alleges, then his exclusive remedy would be under workers' compensation. LSA-R.S. 23:1061 was amended in 1997 and legislatively overruled Kirkland. However, the *221 amendment is applied prospectively only and does not apply to this case.
The plaintiff was employed by Jacobs Engineering as a draftsman. Union Carbide contracted with Jacobs to bring its Taft facility up to date in compliance with OSHA regulations. Draftsmen such as the plaintiff were hired to update the P & ID's at the facility. The defendant claims that it directly employs draftsmen capable of doing the job, but that with the tight deadline demanded by OSHA, it was forced to contract with Jacobs for the extra draftsmen in order to complete the work on time.
The test to determine statutory employee status was set forth by the Supreme Court in Kirkland. The Court held that the appropriate standard for determining whether the contract work is part of the alleged principal's trade, business or occupation is for the court to consider all pertinent factors under the totality of the circumstances. Kirkland, supra at 336. The presence or absence of any one factor is not determinative, and the presence of one factor may compensate for the lack of another. Id. In a tort suit by an injured employee of a contractor, the principal has the burden of proving that the work being performed was part of its trade, business or occupation. Lewis v. Exxon Corp., 441 So.2d 192 (La.1983).
Kirkland provides eight factors to determine statutory employment status. The factors listed by the Court include:
(1) The nature of the business of the alleged principal;
(2) Whether the work was specialized or non-specialized;
(3) Whether the contract work was routine, customary, ordinary or usual;
(4) Whether the alleged principal customarily used his own employees to perform the work, or whether he contracted out all or most of such work;
(5) Whether the alleged principal had the equipment and personnel capable of performing the contract work;
(6) Whether those in similar businesses normally contract out this type of work or whether they have their own employees perform the work;
(7) Whether the direct employer of the claimant was an independent business enterprise who insured his own workers and included that cost in the contract; and
(8) Whether the principal was engaged in the contract work at the time of the incident.
Kirkland, supra at 336.
Defendant Union Carbide is a chemical manufacturer. Jacobs Engineering is a business which performs engineering and drafting services for industrial facilities. The nature of Jacobs business is not substantially similar to that of the defendant, therefore the first of the Kirkland factors has not been satisfied.
The second factor is whether the work was specialized or non-specialized. Several witnesses testified that they were required to train in the use of the software used by the defendant. Furthermore, the job of a draftsman requires extensive on the job training and experience. While the defendant does employ workers able to perform the same functions as the Jacobs employees, the majority of its work is focused on chemical manufacturing. Therefore, the work performed by the plaintiff was specialized.
The third factor is whether the contract work was routine, customary, ordinary or usual. The fourth factor is whether the alleged principal customarily used his own employees to perform the work, or whether he contracted out all or most of such work. The fifth factor is whether the alleged principal had the equipment and personnel capable of performing the contract work. The work performed by the plaintiff was not routine. The updates on the P & ID's were mandated by OSHA and required to be completed by 1997. While the defendant did employ workers trained *222 as draftsmen, they did not customarily perform the same duties as the plaintiff and the limited number of draftsmen employed by the defendant did not leave them capable of performing such duties.
The sixth factor is whether those in similar businesses normally contract out this type of work or whether they have their own employees perform the work. Neither party presented sufficient evidence to adequately determine how other businesses normally provide the type of work performed by the plaintiff.
The seventh factor is whether the direct employer of the claimant was an independent business enterprise who insured his own workers and included that cost in the contract. Jacobs is certainly an independent business enterprise and, despite the defendant's claim to the contrary, Jacobs provided workers' compensation insurance for its employees. Page 2 of Schedule 1 of the contract provides that the owner (defendant) is not required to reimburse the contractor (Jacobs) for workers' compensation. Jacobs has paid workers' compensation to the plaintiff for this injury and has not requested or received reimbursement from the defendant.
The eighth and final factor is whether the principal was engaged in the contract work at the time of the incident. According to witness testimony, only Jacobs employees were drafting the updates to the P & ID's at the Taft facility. The defendant was not engaged in this work at the time that the plaintiff was injured.
Considering all of the above factors under the totality of the circumstances as provided for in Kirkland, it is the opinion of this Court that the trial court did not err in determining that the defendant was not the statutory employer of the plaintiff. Therefore, the plaintiff has a valid cause of action against the defendant for the injuries he has suffered.

Assignments of Error Two, Three and Four
In its second assignment of error, defendant alleges that the trial court erred in finding the plaintiffs testimony to be credible. In its third assignment of error, defendant alleges that the trial court erred in finding that the plaintiff was exposed to amines on July 28, 1994 at the Taft facility. In its fourth assignment of error, defendant alleges that the trial court erred in finding that the plaintiff's sinus surgery was a direct result of an exposure to amines at the Taft facility on the date in question. All three of these issues involve a factual determination of the trial court based on witness testimony and evidence presented to the court. In applying the manifest error standard, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. Rosell v. ESCO, supra at 844. Absent a manifest abuse of discretion, this Court will not reverse the ruling of the trial court on these fact issues.
The first fact issue involves the credibility of the plaintiff, Don Oubre. The defendant alleges that the plaintiff's testimony was inconsistent and was contradicted by the oral, documentary, photographic, and expert witness evidence presented at trial.
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. Rosell v. ESCO, supra at 844. Only the factfinder can be aware of the variations in demeanor and tone of voice that bear heavily on the listener's understanding and belief in what is said. Id. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Id. at 845. But where such factors *223 are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id.
The plaintiff's testimony is slightly inconsistent. However, it is not completely controverted by the evidence as alleged by the defendant. It appears that the ruling of the trial court was based on the decision to credit the testimony of certain witnesses over others. That finding cannot be manifestly erroneous or clearly wrong.
The second issue involves the question of the plaintiff's exposure to amines at the 2 to 1 BIRD centrifuge in the Amines Unit of the Taft facility on July 28, 1994. The facts and evidence presented at trial tend to support the conclusion that the plaintiff was exposed to amines due to a leak at or around the BIRD centrifuge on the date in question.
A central issue in dispute between the parties is the use of the term "leak" as opposed to the term "seep" when describing the condition of the DMV valve directly below the BIRD centrifuge. The defendant claims that the chemical amines solution merely "seeped" from the stem packing on the valve and this seepage could not have caused the injuries claimed to have been suffered by the plaintiff. On the other hand, the plaintiff claims that the stem packing was "leaking" and that this chemical leak was of sufficient quantity to cause the injuries which he has suffered.
As previously noted, an incident report was prepared on August 11, 1994 by an investigation team composed of Union Carbide and Jacobs employees. In the report, the most probable root cause of the plaintiff's injury was reported as a "leak from the seal of the Two to One Bird centrifuge and/or a leak from the packing of the reslurry DMV." At trial, the plaintiff also presented a January, 1994 report prepared by Union Carbide personnel requesting that new seals be installed at the 2 to 1 BIRD centrifuge. This evidence, along with witness testimony, tends to support the conclusion that there were faulty seals at the site of the accident and that the plaintiff was exposed to amines released from these faulty seals. While the testimony of various witnesses contradict each other to some extent as to whether or not a valve leak was noticed both prior to and after the incident on July 28, 1994, the trial court determined that a leak did in fact occur on that date. Considering the vast discretion given to the trial court in determining the credibility of witness testimony, combined with the documentary evidence presented at trial, this Court cannot find that the trial court was manifestly erroneous in determining that the plaintiff was exposed to amines on the date in question.
The third fact issue involves the question of whether or not the plaintiff's sinus surgery was a direct result of an exposure to amines at the Taft facility on the date in question. The defendant alleges that the cause of the plaintiff's injuries was not an exposure to amines, rather that the plaintiff had a prior sinus condition which already necessitated surgery. The plaintiff claims that he did not have a prior sinus condition and he did not have any prior sinus surgery performed before the November, 1994 surgery.
Dr. Steven Abramson was the plaintiff's family physician for many years. He testified at trial that the plaintiff was diagnosed with sinusitis as early as November 6, 1985 and returned for office visits on February 16, 1991 and February 26, 1991. However, these were the only instances when he came to the office for sinus problems prior to August 12, 1994. On the August 12 visit, the plaintiff reported to Dr. Abramson that he was "gassed" at work and was exposed to amines, causing nausea and an irritated throat.
Both parties produced expert witnesses at trial to testify to the effects that an exposure to amines may have on a person's sinuses. The defendant's expert witnesses *224 testified that the plaintiff displayed signs of severe chronic sinusitis consistent with seasonal allergies. At least one of the defendant's experts also testified that he believed that the plaintiff had sinus surgery prior to July 28, 1994. This allegation was not proven at trial, however.
Testimony was presented which indicated that an exposure to amines could cause the symptoms displayed by the plaintiff. Testimony was also presented that the plaintiff's previously diagnosed sinusitis was a common ailment and did not produce symptoms indicative of the extent of the injuries sustained by the plaintiff. Furthermore, the plaintiff produced a Union Carbide Material Safety Data Sheet which described the effects amines may have on a person exposed to the chemical. Included under the heading "Effects of Single Overexposure" were listed the following:
Inhalation:
Vapor is irritating and may cause excessive tear formation, burning sensation of the nose and throat, coughing, wheezing, shortness of breath, nausea and vomiting. Extremely high vapor concentrations may cause lung damage. Some individuals develop asthma.
Skin Contact:
Causes local discomfort or pain, severe excess redness and swelling, tissue destruction, fissures, ulceration, and possibly bleeding into the injured area.
Medical conditions aggravated by overexposure:
Inhalation of material may aggravate asthma and inflammatory or fibrotic pulmonary disease.
The defendant alleges that even if the plaintiff was exposed to a solution of amines due to a leaking valve, the amines solution was not of a high enough concentration to be considered an "overexposure" to the chemical. The plaintiff alleges that he became sensitized to the amines due to the exposure and developed the symptoms of the "amines crud" which eventually led to his sinus surgery.
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. Maranto v. Goodyear Tire & Rubber Co., 94-2603, 94-2615 (La.2/20/95), 650 So.2d 757. Plaintiff must prove causation by a preponderance of the evidence. Id. at 759. The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Id. However, when the tort victim is in good health before the accident, then there is a presumption that the injuries resulted from the accident, provided that the medical evidence establishes a reasonable possibility of causation. Shamsnia v. United Services Auto. Ass'n., 97-399 (La.App. 5th Cir. 10/28/97), 701 So.2d 1051; writ denied, 97-2964 (La.2/6/98), 709 So.2d 739; Maranto, supra at 761. The defendant is then required to go forward with evidence to show some other incident which could have caused the injury. Shamsnia, supra at 1055. There is a threshold requirement that the plaintiff be found healthy before the accident in question. Id.
The defendant alleges that the plaintiff had sinus problems prior to the July 28, 1994 accident. The trial court did not accept this argument. The trial court held that the plaintiff was in good health prior to the accident in question, therefore there is a presumption that the accident caused the injury. There was sufficient medical evidence presented to establish a reasonable possibility of causation from amines exposure.
Taking into consideration the plaintiff's previously diagnosed sinusitis, this condition would appear to have been aggravated by the amines exposure on the date in question. When an employee proves that before the accident he had not manifested disabling symptoms, but that commencing with the accident the disabling symptoms appeared and manifested *225 themselves thereafter, and that there is either medical or circumstantial evidence indicating a reasonable possibility of causal connection between the accident and the activation of the disabling condition, the employee's work injury is presumed to have aggravated, accelerated or combined with his pre-existing disease or infirmity to produce his disability. Peveto v. WHC Contractors, 93-1402 (La.1/14/94), 630 So.2d 689. The defendant thereafter bears the burden of proving that the work injury did not accelerate, aggravate or combine with the pre-existing disease or infirmity to produce the disability. Id. at 691.
The trial court did not err in finding that the amines exposure on July 28, 1994 caused the plaintiff's injuries. Even had there been a pre-existing condition, there was sufficient evidence presented to prove that the exposure would have aggravated the condition to cause the injuries.

Assignments of Error Five and Six
In its fifth assignment of error, defendant alleges that the trial court erred in finding it negligent. In its sixth assignment of error, defendant alleges that the trial court erred in finding it strictly liable in the absence of any evidence of a defect in the 2 to 1 BIRD centrifuge. It is the opinion of this Court that the trial court did not commit manifest error in finding the defendant liable for the injuries suffered by the plaintiff.
The trial court found the defendant liable to the plaintiff under the theories of negligence and strict liability. LSA-C.C. art. 2315 encompasses the theory of negligence. The article states:
"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
Damages may include loss of consortium, service, and society and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person."
Prior to the 1996 Tort Revision, which became effective April 16, 1996, LSA-C.C. art.1917 encompassed the theory of strict liability. This version of the article was in effect at the time of the accident in question. The article states:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."
The defendant alleges that the plaintiff failed to prove that there was a defect in the equipment at or around the 2 to 1 BIRD centrifuge in the Amines Unit at the Taft facility. The trial court held that there was indeed a faulty stem packing around the DMV valve which caused the amines leak which injured the plaintiff. We agree.
This Court will first address the theory of negligence. In order to determine whether liability exists under the facts of a particular case, Louisiana courts apply a duty/risk analysis. Peterson v. Gibralter Sav. and Loan, 97-725 (La.App. 5th Cir. 2/20/98), 711 So.2d 703. Under this analysis, the plaintiff must prove:
(1) the conduct in question was the cause-in-fact of the resulting harm,
(2) defendant owed a duty of care to the plaintiff,
(3) the requisite duty was breached by the defendant, and
(4) the risk of harm was within the scope of protection afforded by the duty breached.
Id. at 706. Whether a duty is owed is a question of law, whereas, whether the defendant has breached a duty owed is a question of fact. Id.
In general, the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons in his premises and the duty of not exposing such persons to unreasonable risks of injury or harm. Id. at 707. In determining *226 whether a thing creates an unreasonable risk of harm, the court must balance the likelihood and magnitude of the harm against the utility of the thing. Fisher v. River Oaks, Ltd., 93-677 (La.App. 5th Cir. 3/16/94), 635 So.2d 1209. In addition, the trier of fact should also consider a broad range of social, economic, and moral factors including the defendant's cost of avoiding the risk and the social utility of the plaintiff's conduct at the time of the accident. Id. at 1215.
The first factor in the duty/risk analysis is causation. The trial court has held that the leak in the stem valve is what caused the amines leak that injured the plaintiff. The issue of causation has been addressed in Assignment of Error Four and need not be revisited.
The second factor in the duty/risk analysis is whether or not the defendant owed a duty of care to the plaintiff. This is an issue of law. The defendant, as the owner of the facility, owes a duty to those lawfully on the premises to keep the premises safe. Therefore, the defendant owed a duty of care to the plaintiff.
The third factor in the duty/risk analysis is whether or not the requisite duty was breached by the defendant. Witness testimony and documentary evidence revealed that an exposure to amines can have harmful side effects. As noted previously, the Union Carbide Material Safety Data Sheet lists the various effects of overexposure to amines. The trial court held that the conditions in the Taft facility were unsafe due to the regularity of leaks which occurred on a monthly basis. The trial court did not err in this finding. Therefore, the duty of care has been breached.
The fourth and final factor in the duty/risk analysis is whether or not the risk of harm was within the scope of protection afforded by the duty breached. According to expert witness testimony, the risk of harm from exposure to amines is great. Fact witnesses testified to the symptoms often displayed by those people exposed to amines called "amines crud." Based upon the facts presented at trial, the trial court ruled that the risk of harm was within the scope of protection afforded to the plaintiff by the defendant. It is the opinion of this Court that the trial court was not manifestly erroneous in this assessment. Absent a finding of manifest error, we affirm the trial court's finding of negligence by the defendant.
The Court will next address the theory of strict liability. The only difference between the negligence theory and strict liability is that the plaintiff is not required to prove that the defendant knew or should have known of the existence of the defect. Fisher, supra at 1215. To prove liability under LSA-C.C. art. 2317, the plaintiff must show that the thing which caused damage was in the care and custody of the defendant, the thing had a vice or defect that created unreasonable risk of injury to another, and the defect caused the injury. Orillion v. Alton Ochsner Medical Foundation, 97-115 (La.App. 5th Cir. 5/28/97), 695 So.2d 1063; writ denied, 97-1725 (La.10/13/97), 703 So.2d 617; 2304 Manhattan Blvd. Partnership v. Louisiana Power & Light Co., 94-192 (La. App. 5th Cir. 9/14/94), 643 So.2d 1282. Strict liability requires the plaintiff to prove that the vice or defect of the thing is a condition which poses an unreasonable risk of harm to others. Celestine v. Union Oil Co. of California, 94-1868 (La.4/10/95), 652 So.2d 1299.
There is no question that the defendant was in custody of the defective equipment. The accident occurred at or around the 2 to 1 BIRD centrifuge in Union Carbide's Taft facility. Evidence presented at trial revealed that the seals at the 2 to 1 BIRD centrifuge were in need of replacing months before the accident even occurred. Testimony and evidence presented at trial support the conclusion that the defect caused an unreasonable risk of harm. Trial testimony established that if the valve seals were defective and in *227 need of replacing, this would cause a leak in the valve which would release the amines. Documents were presented which establish that an overexposure to amines may cause serious health problems. Various expert witnesses testified to the adverse effects an exposure to amines may have on an individual. The defect therefore caused an unreasonable risk of harm.
There is an irrebuttable presumption that the custodian had knowledge of the defective condition. 2304 Manhattan Blvd. Partnership, supra at 1285. Once the plaintiff has established a defect and custody, the only defenses available are the fault of the victim, the fault of a third person, or causation by irresistible force. Id.
Defect and custody have been established. The defendant has failed to prove that the injuries were caused by the fault of the victim, the fault of a third person, or causation by an irresistible force. Therefore, under the theory of strict liability, the defect must have caused the injury. The trial court did not err in finding the defendant strictly liable for the plaintiff's injuries.

Assignment of Error Seven
In its seventh assignment of error, the defendant alleges that the trial court erred in awarding exemplary damages to the plaintiff. Prior to its repeal in 1996, LSA-C.C. art. 2315.3 provided in part:
"In addition to general and special damages, exemplary damages may be awarded, if it is proved that the plaintiffs injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances."
The defendant alleges that the trial court's reasoning for awarding exemplary damages was incorrect. According to the defendant, the trial court did not penalize it for a wanton or reckless disregard for public safety, but rather for defending itself at trial.
The purpose of punitive damages is to punish and deter wrongdoers. Rivera v. United Gas Pipeline Co., 96-502 (La.App. 5th Cir. 6/30/97), 697 So.2d 327; Billiot v. B.P. Oil Co., 93-1118 (La.9/29/94), 645 So.2d 604. Exemplary damages are allowed where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime. Billiot, supra at 612.
The purpose of LSA-C.C. art. 2315.3 is threefold: (1) to penalize and punish defendants for engaging in wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances that causes injury to others; (2) to deter the tortfeasors and others who might follow their example from exposing the public to dangers of that kind in the future; and (3) to provide victims injured by such conduct with the incentive to act as the prosecutors of penal laws against such wrongdoers. Rivera, supra at 334; Billiot, supra at 612.
The trial court erred in awarding exemplary damages to the plaintiff. In its Reasons for Judgment, the trial court states:
"In spite of the overwhelming evidence that Mr. Oubre was exposed to Amines and suffered serious injury as a result of that exposure, Union Carbide denies that Mr. Oubre was even exposed to Amines. Union Carbide has attempted to convince everyone, including this Court, that Mr. Oubre is simply making-up the fact that he was exposed to Amines. In light of that attitude, this Court finds that Union Carbide displays a lack of concern over the serious nature of Amines exposure. This Court also finds that Union Carbide's safety procedures are inadequate."
The defendant is correct in alleging that these reasons are not proper for awarding exemplary damages.
*228 In order to obtain an award of exemplary or punitive damages, the plaintiff must first prove the defendant's conduct was wanton or reckless. Rivera, supra at 334; Billiot, supra at 613. The "wanton" or "reckless" conduct that must be proved is highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. Id. Second, the plaintiff must show that the danger created by the defendant's wanton or reckless conduct threatened or endangered the public safety. Id. Third, the statute requires proof that the defendant's wanton or reckless conduct occurred in the storage, handling, or transportation of hazardous or toxic substances. Id. Finally, the plaintiff is required to prove that his or her injury was caused by the defendant's wanton or reckless conduct consisting of all of these elements. Id.
The evidence presented at trial did not establish that the defendant acted with a wanton or reckless disregard for the public safety. Furthermore, the defendant's actions were not intentional or deliberate, and did not display "the character of outrage frequently associated with crime."
The plaintiff must show that the danger created by the defendant's wanton or reckless conduct threatened or endangered the public safety. The plaintiff failed to prove that the accident was anything more than an isolated incident. While evidence of prior leaks at the facility was produced, there was no evidence presented of prior injuries or accidents which would have alerted the defendant to a potential harmful occurrence. The plaintiff failed to prove that the defendant's conduct was an extreme departure from ordinary care in the handling or storage of a toxic substance.
The trial court apparently found the defendant liable for exemplary damages because it denied that the plaintiff was exposed to amines. This is not a proper foundation for the award of exemplary or punitive damages. The defendant merely attempted to defend itself in the best possible manner at trial. The defendant's conduct was not proven to be wanton or reckless nor was it proven to be intentional or deliberate. Therefore, the trial court's award of exemplary damages was manifestly erroneous and must be reversed.

Assignment of Error Eight
In its eighth and final assignment of error, the defendant alleges that the trial court erred in the quantum award of damages. The defendant alleges that the general award of $700,000, the loss of consortium award of $45,000 and the exemplary damages award of $1,000,000 are beyond reason and clearly erroneous.
In appellate review of general damage awards, the court must accord much discretion to the trial court judge or jury. LSA-C.C. art. 2324.1; Andrus v. State Farm Mut. Auto. Ins. Co., 95-0801 (La.3/22/96), 670 So.2d 1206. Because discretion vested in the trial court is "great," and even vast, an appellate court should rarely disturb an award of general damages. Id. at 1210; Nusloch v. Browning-Ferris Services, Inc., 97-528 (La.App. 5th Cir. 11/25/97), 703 So.2d 794; Roig v. Travelers Ins. Co., 96-164 (La.App. 5th Cir. 12/11/96), 694 So.2d 362; writ denied, 97-0721 (La.5/1/97), 693 So.2d 739. Reasonable persons frequently disagree about the measure of general damages in a particular case. Andrus, supra at 1210. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Id.
After evaluating the testimony of various fact witnesses, the trial court determined that the plaintiff was in excellent health before the injury. Furthermore, the trial court determined that as a result of his exposure to amines, his mental and physical capabilities have deteriorated.
*229 The trial court determined that the medical evidence presented by the expert witnesses established that the plaintiff has suffered "serious, permanent and disabling injuries, including but not limited to, injuries to his lower and upper respiratory tracts, a brain injury and impairment, and significant restrictions and limitations of his ability to engage in many activities." These injuries are a direct result of the plaintiff's exposure to amines at the defendant's facility.
The defendant cites various cases to support its position that the trial court's quantum award of damages was excessive. However, an appellate court must only resort to a review of prior awards to determine the appropriate modification of the award when it determines that the factfinder abused its discretion. Roig, supra at 378; LeBlanc v. Continental Grain Co., Inc., 95-813 (La.App. 5th Cir. 3/13/96), 672 So.2d 951; writ denied, 96-1526 (La.10/4/96), 679 So.2d 1383. Prior awards under similar circumstances serve only as a general guide. Roig, supra; LeBlanc, supra at 961.
It is the opinion of this Court that the trial court did not abuse its vast discretion in awarding general damages or loss of consortium damages to the plaintiffs. Absent such, the award of $700,000 in general damages and $45,000 in loss of consortium damages must be affirmed. As discussed above in Assignment of Error Seven, the trial court's award of exemplary damages was erroneous. Therefore, the award of $1,000,000 in exemplary/punitive damages must be reversed.

Plaintiff's Answer to the Appeal
The plaintiff filed an answer to the appeal alleging that the award of damages was abusively low. First, the plaintiff alleges that the trial court erred in calculating the loss of future earning capacity. Second, the plaintiff alleges that the award of general damages and loss of consortium damages were abusively low. Third, the plaintiff alleges that the trial court erred in not awarding damages for the loss of insurance/fringe benefits. Finally, the plaintiff alleges that the award of exemplary/punitive damages was abusively low.
The first issue raised by the plaintiff in his answer to the appeal is the trial court's calculation of his loss of earning capacity. At trial, Dr. Randolph Rice testified as an expert in the field of economics. He testified that the plaintiffs future lost earnings would amount to $243,498, after a deduction for the plaintiff returning to a minimum wage job one year from the date of the trial. Dr. Rice then testified that the plaintiff's future lost earning capacity would amount to $460,588, also taking into consideration a return by the plaintiff to minimum wage employment. The plaintiff alleges that the trial court's award of $243,498 in future lost earnings was abusively low and did not take into account his future earning capacity.
Awards of loss of future earning capacity are speculative by nature and cannot be calculated with mathematical certainty. Stockstill v. C.F. Industries, Inc., 94-2072 (La.App. 1st Cir. 12/15/95), 665 So.2d 802; writ denied, 96-0149 (La.3/15/96), 669 So.2d 428. Therefore, the trier of fact necessarily must have much discretion in fixing such awards. Id. at 818.
In determining an award for loss of earnings and earning capacity, what the plaintiff earned before and after the injury does not constitute the measure. Maranto v. Goodyear Tire & Rubber Co., 25,114 (La.App. 2nd Cir. 5/10/95), 661 So.2d 503. While the plaintiff's earning capacity at the time of injury is relevant, it is not necessarily determinative of his future ability to earn. Id. at 506. Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury. Id.
The trial judge determined that Dr. Rice's estimation of future earning capacity was speculative. It was the opinion of *230 the trial court that the plaintiff had reached his full earning capacity at the time of the accident and this accounted for the award of $243,498 in future lost earnings. Absent a manifest abuse of discretion, we do not find that the trial court erred in this award.
The second issue raised by the plaintiff is that the award of general damages and loss of consortium damages were abusively low. As noted above under Assignment of Error Eight, the trial court has vast discretion in determining an award of general damages. This applies to loss of consortium damages as well. Absent a manifest abuse of discretion, we do not find that the trial court erred in awarding the sums of $700,000 in general damages or $45,000 in loss of consortium damages.
The third issue raised by the plaintiff is that the trial court erred in not awarding damages for the loss of insurance/fringe benefits. The plaintiff alleges that the defendant should be held liable for any and all insurance and fringe benefits that he has lost as a result of this accident.
Fringe benefits are an item of damages recoverable as a matter of law. Goodwyne v. People's Moss Gin, Inc., 96-1340 (La.App. 3rd Cir. 4/30/97), 694 So.2d 1101; writ denied, 97-2041 (La.11/21/97), 703 So.2d 1309.
Dr. Rice testified at trial that the plaintiff will lose $23,900 in future insurance/fringe benefits as a result of his inability to return to work as a draftsman. The trial court did not factor this amount into the plaintiffs future lost earnings. It is the opinion of this Court that the trial court erred in failing to award the plaintiff $23,900 in future lost insurance/fringe benefits and the judgment should be amended accordingly.
The fourth and final issue raised by the plaintiff in his answer to the appeal is that the award of exemplary/punitive damages was abusively low. As stated above in Assignment of Error Seven, the award of exemplary/punitive damages in any amount was manifestly erroneous. Therefore, the plaintiffs claim is without merit and must be denied.

CONCLUSION
It is the opinion of this Court that the trial court did not err in its award of general damages and loss of consortium damages to the plaintiffs. The award of $700,000 in general damages and $45,000 in loss of consortium damages was neither abusively high nor abusively low. However, it is the opinion of this Court that the award of exemplary/punitive damages was manifestly erroneous. The trial court's judgment of $1,000,000 for exemplary damages must be reversed. Finally, it is the opinion of this Court that the award of $457,746.33 in special damages must be amended to include an additional award of $23,900 for future insurance/fringe benefits.
AFFIRMED IN PART, REVERSED IN PART AND AMENDED.